ALICE C. BROWN, GERTRUDE K. HUMPHRIES, LILA KISTEMAKER, GORDON BROWN, WILFRED HAYDEN HUMPHRIES, GERTRUDE ANN HUMPHRIES AND CLIFFORD KEMPTON HUMPHRIES *v.* BISHOP TRUST COMPANY, LTD., SUCCESSOR-TRUSTEE OF THE SARAH BROWN TRUST.

No. 4158.

August 16, 1960.

Tsukiyama, C. J., Marumoto, Cassidy, Lewis, JJ., and Circuit Judge Hawkins in Place of Wirtz, J., Disqualified.

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal by Alice C. Brown, Gertrude K. Humphries, Lila Kistemaker, Gordon Brown, Wilfred Hayden Humphries, Gertrude Ann Humphries and Clifford Kempton Humphries, plaintiffs, from a summary judgment in favor of Bishop Trust Company, Limited, defendant, in a civil action for accounting and other relief in connection with two trusts created by Sarah E. Brown, settlor, by trust deeds dated August 26, 1921, and June 9, 1927, respectively.

In both trust deeds, settlor named Henry Waterhouse Trust Company, Limited, as trustee. Henry Waterhouse Trust Company, Limited, was merged with Bishop Trust Company, Limited, on December 30, 1933. Hereafter, the word "trustee" will be used to refer to Henry Waterhouse Trust Company, Limited, only, and Bishop Trust Company, Limited, will be referred to as "defendant."

Plaintiffs brought their action as beneficiaries of both trusts. The earlier trust deed provided for the payment of a portion of the trust income, upon settlor's death, to settlor's children in equal shares, and, if any of settlor's children should die leaving issue, to such issue per stirpes. It also provided for the distribution of the corpus to

settlor's grandchildren per stirpes upon the death of the last survivor of settlor's children. The later trust deed contained similar provisions. Settlor died on November 11, 1937. Alice C. Brown and Gertrude K. Humphries are settlor's daughters. Lila Kistemaker and Gordon Brown are children of settlor's son, Kenneth F. Brown, who died in May 1933. Wilfred Hayden Humphries, Gertrude Ann Humphries and Clifford Kempton Humphries are children of Gertrude K. Humphries. We shall hereafter refer to plaintiffs, other than Clifford Kempton Humphries and Gertrude Ann Humphries, by their first names. Clifford Kempton Humphries and Gertrude Ann Humphries will be referred to as Kempton and Gertrude Ann, respectively. We shall refer to Kenneth F. Brown as Kenneth.

Plaintiffs predicated their claim for relief upon alleged breaches of trust on the part of trustee in the administration of both trusts, and upon defendant's liability for such breaches of trust under S.L.H. 1931, c. 169, as successor trustee upon merger. S.L.H. 1931, c. 169, provided that "The rights, obligations, trusts, liabilities and relations of every nature of the trust company being merged to any * * * beneficiary of any trust * * * shall remain unimpaired, and the trust company into which it shall have been merged shall by such merger succeed to all such rights, relations, obligations, liabilities and trusts, and shall execute and perform all the same in the same manner as though it had itself originally acquired the right, assumed the relation or trust, or incurred the obligation or liability; * * *"

The claim for relief was set forth in a lengthy amended complaint of twenty-three pages typewritten in elite type. The complaint appears to run afoul of the provision of H.R.C.P., Rule 8 (a), that a pleading shall contain "a short and plain statement of the claim showing that the

pleader is entitled to relief," and the provision of H.R.C.P., Rule 9 (b), that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." However, we make this observation only in passing, for here the form of the complaint is not in question. Defendant moved for a summary judgment on two grounds: first, that a legally sufficient release had been executed by certain of plaintiffs; and, second, that the doctrine of laches precluded plaintiffs from asserting any right at the time that they brought their action. The trial court granted defendant's motion on the second ground.

The propriety of entering a summary judgment on the ground of laches of the party seeking relief is no longer an open question in this jurisdiction. We recently held in *Yokochi* v. *Yoshimoto*, 44 Haw. 297, that summary judgment may be entered "where, as here, all the elements of laches are apparent from the pleadings and no question of fact remains to determine the existence of the defense."

Under H.R.C.P., Rule 56 (c), summary judgment will be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Here, the pertinent pleadings consisted of plaintiffs' amended complaint and defendant's motion for summary judgment. The amended complaint referred to numerous documents which were attached thereto as exhibits. The motion was supported by affidavits of defendant's counsel and officers and pertinent exhibits which were duly certified. In opposition to the motion were counter affidavits of Alice, Gertrude and Kempton.

Thus, the sole question for decision on this appeal is whether the amended complaint, affidavits, counter affidavits, and exhibits on file raise any genuine issue of

material fact regarding plaintiffs' laches. In deciding this question, only the facts concerning laches are material. But such facts must be considered in their setting if their meaning is to be properly understood. Consequently, we shall set forth the history of the two trusts and the events which led to the present controversy.

By the trust deed of August 26, 1921, settlor conveyed Puuohoku Ranch on Molokai and her real estate on Kalia Road, Honolulu, to trustee in trust, subject to mortgage liens aggregating $80,000. Settlor reserved the right to revoke the trust so created by delivering a written notice to trustee.

Trustee sold a portion of the Kalia Road property on May 13, 1926, and the remainder on June 5, 1926. Settlor joined in the deeds which were executed in connection with these sales. A part of the proceeds of such sales was used to purchase an addition to Puuohoku Ranch and also to purchase residential properties on East Manoa Road and Kakela Drive, Honolulu. The balance was used to pay off the mortgage liens.

On June 1, 1927, trustee reconveyed Puuohoku Ranch to settlor. The reconveyance left the trust without any corpus. Thus, its practical effect was to terminate the trust without complying with the formality for revocation specified in the trust deed. On the same day, immediately after the reconveyance, settlor mortgaged to trustee the properties which she then owned, including the ranch, to secure a loan of $75,000.

By the trust deed of June 9, 1927, settlor conveyed in trust to trustee the properties which she mortgaged to trustee on June 1, 1927, subject to such mortgage. Under the trust so created, settlor was entitled to the payment of $250 monthly from the income of the trust, and from the corpus if the income should be insufficient for the purpose. She also had the right to reside at the East

Manoa Road residence or at any other premises of the trust which she might designate. Her written consent was required for the sale or exchange of any land by trustee. Trustee had the authority to borrow money for the purposes of the trust from any person, including itself, and to give security for the repayment of such borrowings. It was empowered to operate Puuohoku Ranch, but was required, in that connection, to employ Kenneth as manager so long as he lived and desired to hold such position. The trust was subject to amendment by settlor but was irrevocable.

As of June 30, 1929, in addition to the sum of $75,000 mentioned in the trust deed of June 9, 1927, trustee had advanced $74,565.37 for the purposes of the trust and for the benefit of settlor and her children. So, on July 2, 1929, Kenneth, Alice, and Gertrude assigned their contingent interests in the Maria King Trust to trustee as security for such additional advances. Maria King was settlor's mother. She had left her estate in trust to pay the income to settlor for life and the corpus to settlor's children upon settlor's death. Also, on July 2, 1929, settlor executed an amendment of the trust deed which recognized the additional advances as an obligation of the trust and granted to trustee a lien upon all trust property to secure such advances and any further advances, whether such further advances were made for the original purposes of the trust or for settlor's individual benefit.

On December 30, 1930, the additional advances amounted to $97,510.48, and on June 30, 1931, the amount of such advances stood at $100,587.21. In the meantime, Kenneth, Alice, and Gertrude consulted attorney Frank E. Thompson, who, on May 29, 1931, sent a letter to trustee proposing that the loan be cleared by settlor's children assigning to trustee, by proper instrument joined in by settlor, all of their interests in Puuohoku Ranch and the

properties on East Manoa Road and Kakela Drive, subject to the agreement that settlor's interest in the Maria King Trust be secured to her for life. Settlor, Kenneth, Alice, and Gertrude indicated their approval of the proposal by affixing their initials to the attorney's letter.

Trustee did not accept the proposal. Instead, on June 30, 1931, it executed a mortgage of all of the trust property to itself to secure the additional advances of $100,587.21, in accordance with the authority contained in the trust deed. Also on the same day, it caused settlor to execute further amendments to the trust deed. The amendments added the requirement that any future amendment of the trust deed be made with trustee's written consent, and eliminated the provisions which required trustee to pay $250 monthly to settlor regardless of the financial condition of the trust, to employ Kenneth as manager of Puuohoku Ranch, and to obtain settlor's written consent to the sale or exchange of any land belonging to the trust. The mortgage had the written approval of settlor and Kenneth. The amendments to the trust deed, in addition to being executed by settlor, had the written approval of Kenneth and Alice.

As previously noted, Kenneth died in May 1933. Two months later, on July 17, 1933, trustee sold Puuohoku Ranch for $75,000. This was the last action of trustee mentioned in the amended complaint prior to its merger with defendant on December 30 of the same year.

In October 1935, Alice and Gertrude saw attorney Henry Holmes about the purchase of the Kakela Drive property for settlor and about the administration of the trust, as to which suspicion had arisen in their minds because of the heavy losses to it. Plaintiffs' version regarding Holmes' role in the matters about which he was consulted differs from defendant's version. Plaintiffs' version appears in their amended complaint where they

stated that Holmes was indifferent to the inquiries of Alice and Gertrude, declined to look into the administration of the trust, and did not make any commitment about handling the matter of the purchase of the Kakela Drive property. Defendant's version, as set forth in the affidavit of its counsel, was that Holmes actively participated in the drafting of the indenture signed by settlor, Alice, Gertrude, and defendant on February 24, 1936, which is described below and which concerned these matters.

On February 24, 1936, settlor and defendant executed a further amendment to the trust deed of June 9, 1927, which provided for the vesting of the remainder interest of the trust estate in Alice and Gertrude absolutely upon settlor's death and for the termination of such remainder interest of Alice and Gertrude "if the only remaining asset in said Trust estate, aside from the sum of $16.75 cash on hand, to-wit, those certain premises situated at 1955 Kakela Drive, Honolulu, shall have been sold prior to the Settlor's death, and the net proceeds thereof, together with said sum of $16.75, shall have been applied towards certain indebtedness of the Settlor to Bishop Trust Company, Limited; leaving a balance owing by the Settlor to the said trust company in its individual capacity." This amendment eliminated Lila and Gordon, as well as Wilfred, Gertrude Ann and Kempton, as contingent remaindermen of the trust.

Thereafter, on the same day, settlor, Alice, Gertrude, and defendant executed an indenture whereby (a) Alice and Gertrude confirmed defendant's right to their contingent interests in the Maria King Trust under the assignment which they made to trustee on July 2, 1929; (b) settlor, Alice and Gertrude released trustee and defendant from any and all claims and liabilities in connection with the trust from its inception to the date of the indenture, and agreed that settlor's debt to defendant, in its

individual capacity, on January 14, 1936, was $86,397.59 and that the assets of the trust were subject to a mortgage lien in favor of defendant for such sum; (c) settlor and Gertrude agreed with defendant that it might sell the Kakela Drive property to Alice for $6,500 and apply the proceeds to the reduction of settlor's indebtedness, and (d) defendant agreed to pay to settlor the net income from the Maria King Trust during her lifetime.

Upon settlor's death on November 11, 1937, the Maria King Trust was terminated, and the interests of Alice and Gertrude were distributed to defendant in accordance with their assignment. On April 14, 1938, defendant released the mortgage executed by trustee to itself as creditor on June 30, 1931.

Thereafter, nothing transpired until Kempton, upon noting how Alice and Gertrude talked about the ranch after their visit to Molokai in October 1954, "decided that, since no one had ever looked into the matter, he would see what he could unearth." Plaintiffs brought instant action on March 22, 1956.

No irregularity is apparent in the foregoing resume of the history of the two trusts. At least on the surface, trustee and defendant complied with the letter of the trust deeds.

However, in their amended complaint, plaintiffs alleged that trustee committed breaches of trust in selling the Kalia Road property which was a money maker, in retaining and operating Puuohoku Ranch which was a losing proposition, and in selling the ranch to one of defendant's directors at a grossly inadequate price; that trustee and defendant obtained the signatures of settlor and her children to the various documents mentioned above by fraudulent concealment and misrepresentation of facts; and that defendant was liable for trustee's breaches of trust as successor trustee on merger.

In their joint affidavit filed subsequently to defendant's motion for summary judgment, Alice and Gertrude alleged that the acts ostensibly done in the name of trustee between April 1933 and December 1933, including the sale of Puuohoku Ranch, were really done by defendant. They thus sought to hold defendant directly responsible for such acts, and, to that extent, modified plaintiffs' position in the amended complaint.

Here, we are not concerned with the truth or falsity of such allegations in the plaintiffs' amended complaint and in the joint affidavit of Alice and Gertrude. The question before us is: Assuming that such allegations are true, do the pleadings, affidavits, counter affidavits, and exhibits on file indicate the existence of a genuine issue of material fact as to whether plaintiffs failed to sue for so long a time and under such circumstances that it would be inequitable to require defendant to go to trial? We shall consider this question by dividing plaintiffs into three groups, Alice and Gertrude in one group, Lila and Gordon in another group, and Wilfred, Gertrude Ann, and Kempton in still another group.

Until the amendment of February 24, 1936, Alice and Gertrude had contingent remainders in the trust. Assuming that the amendment of February 24, 1936, was invalid by reason of the alleged fraudulent concealment and misrepresentation of facts by defendant and that the trust deed of June 9, 1927, continued in force despite such amendment, the interests of Alice and Gertrude in the trust became vested upon settlor's death on November 11, 1937. There is no question as to the right of a vested remainderman to sue a trustee for breach of trust. Thus, if trustee and defendant had committed breaches of trust as alleged, Alice and Gertrude had an unquestioned right to sue defendant at any time after November 11, 1937. On that date and at all times thereafter, neither Alice

nor Gertrude was under any legal incapacity. But they waited more than eighteen years to bring their action.

Alice and Gertrude sought to excuse the delay on the ground that they were unaware that defendant could be held liable for trustee's breaches of trust. Alice alleged in her separate affidavit that "affiant thought that her rights as beneficiary had been converted into and reduced to her rights against the trustee based on its said dissipation of the trust property, but that affiant thought that the liability to her of Waterhouse Trust Co., Ltd., trustee, had become unenforceable and worthless as an asset of the trust estate upon the insolvency of said trustee and upon its merger with Bishop Trust Co., Ltd., trustee." Gertrude similarly stated in her separate affidavit that "affiant's said mother, her sister Alice C. Brown, a beneficiary of said trust, and affiant all thought that they had been victims of maladministration, mismanagement and misappropriation of trust property by Waterhouse Trust Co., Ltd., trustee in said trust, as in fact they were, but that they erroneously thought they had no recourse after this company's merger with Bishop Trust Company, Ltd., and the latter's succession as trustee in said trust."

Alice and Gertrude may not avail themselves of such excuse because defendant's liability for trustee's acts is based on a public statute and not on any private agreement between the two trust companies. The law applicable to this situation is stated in 3 Merrill on Notice, § 1104, as follows: "Even more apt is it to say that the solemn decrees of the legislature, enacted in accordance with established formula and phrased in the imperative tones of sovereignty, are notification to all concerned of what they contain." See 39 Am. Jur., *Notice and Notices*, § 25.

Alice and Gertrude also sought to excuse the delay on the ground that defendant misrepresented to them

that trustee was not under any liability to them or to the trust.

In this connection, Alice alleged in her separate affidavit "That Bishop Trust Co., Ltd., trustee, represented to affiant that the only property left in said trust was $16.75 and the Kakela Street property, that she had no right or interest as beneficiary except in said property, thereby implying or withholding from affiant and leading her to believe that she had no right to hold said trustee liable for the breaches of trust and mismanagement of Waterhouse Trust Co., Ltd., trustee;" and Gertrude also alleged in her separate affidavit "that the said Bishop Trust Company, Ltd., trustee, dealt unfairly with her said sister and affiant in leading and knowingly allowing them to understand that they had no claim against said trustee."

Alice and Gertrude later realized that this excuse was inconsistent with their earlier admission of knowledge of trustee's liability for its breaches of trust. So, in their joint affidavit, they sought to avoid the effect of such admission by stating: "That affiants' statements in their affidavits filed herein on June 6, 1956, to the effect that they were aware of substantial liabilities on the part of the trustee, when they executed the release on February 24, 1936, were colored by affiants' recent discovery of the grievous wrongdoing of the trustee, as catalogued in the Amended Complaint, which wrongdoing, being fresh in the minds of affiants at the time had greatly incensed affiants and caused them to commit the anachronism of relating their newly acquired knowledge back to the time of said release."

Such explanation is not convincing. However, even if it were true, it is immaterial whether Alice and Gertrude knew that trustee was legally liable, for, according to other allegations in the amended complaint and in their

affidavits, there were enough facts staring them in the face to put them upon inquiry. Under the record, there can be no genuine issue as to the reason for their failure to sue. Their failure to sue was not due to defendant's misrepresentation to them regarding trustee's liability. They did not sue because they "realized that the trustee, being insolvent and out of business could not have been held financially accountable, even if their doubts about the trustee were confirmed."

The amended complaint contained the allegation that until they brought the instant action, plaintiffs "were ignorant of their rights herein asserted against the trustee and the defendant and of the corresponding liabilities of the trustee and of the defendant and having confidence in the integrity and business judgment of the trustee and of the defendant made no inquiry with respect thereto."

We answer such allegation by citing the case of *Norris* v. *Haggin,* 136 U.S. 386. That was a case which involved a factual situation similar in many respects to this case. The plaintiff sought to recover certain real estate which he had lost in a mortgage foreclosure. In his bill, he gave a very lengthy account of what he called "fraud and imposition" practiced upon him by the defendants, who had been his agents and attorneys. He brought his suit fifteen years after he consulted one Beatty, who had in some early cases been his attorney, "for information concerning his affairs with defendants, and was advised by him that he could not act for him as he had been employed by the defendants." He alleged that the fraud did not come to his knowledge until a short time before he commenced the suit, and then only through information derived from his counsel in the case. His excuse for not seeking other advice or making other investigation after Beatty turned him down was that he was "ignorant of all the facts necessary to lay before an attorney, and could not communicate

with a stranger so as to make himself intelligible, and felt himself compelled to accept the status of his affairs as he found them, and was incompetent to investigate and discover for himself the facts and matters hereinbefore recited." In affirming a decree which dismissed the bill on the ground of laches, the court stated:

"Even the principle of a court of equity, that time does not begin to run against a party on whom a fraud has been committed until that fraud has been discovered, can do the plaintiff no good in the present case. That he knew about the fraud, if there was one, in 1869, when he applied to Beatty, who refused to take his case; and that the facts out of which he was bound to know this fraud, if his bill be true, existed, were open, were patent, and could not fail to be discovered by any sort of inquiry or investigation, is so clear that there is no room for the doctrine of his having discovered these facts only a year or two before the suit was brought, or indeed after he had employed counsel.

"It is a part of this general doctrine, that to avoid the lapse of time or statute of limitation, the fraud must have been one which was concealed from the plaintiff by the defendant, or which was of such a character as necessarily implied concealment. Neither of these principles can apply to the defendants in this case. The acts which constituted the fraud as alleged in the bill were open and public acts. * * * The very circumstances that in 1869 the plaintiff consulted a lawyer upon this subject, shows that he was aware of the fact that defendants were contesting his right to the property, and that, if he had made any inquiry at all, he must have known of the proceedings on which they rested their title."

It is stated in Scott on Trusts, 2d ed., vol. II, § 219:

"A beneficiary may be barred by his laches from holding the trustee liable for a breach of trust. He is so barred if he fails to sue the trustee for the breach of trust for so long a time and under such circumstances that it would be inequitable to permit him to hold the trustee liable. Among the circumstances which are of importance are the length of time during which the beneficiary has delayed in bringing a proceeding against the trustee; the reasons for such delay; the character of the breach of trust; the change of circumstances, if any, between the commission of the breach of trust and the bringing of the proceeding, such as the death of witnesses or parties, or a change of position by the trustee." See Restatement of the Law of Trusts, § 219, Comment on Subsection (1).

With but one exception, namely, the change of circumstances between the commission of the breach of trust and the bringing of the proceeding, we have already discussed all of the considerations mentioned by Scott as they relate to Alice and Gertrude. We shall now take up the matter of the change of circumstances which took place during the period of the delay.

The amended complaint and the affidavits of Alice and Gertrude contain the constant refrain that settlor and her children did not question the actions of trustee and defendant because of their confidence in their integrity and business judgment. But that did not prevent them from consulting attorneys Frank E. Thompson and Henry Holmes. Thompson was consulted in May 1931, just before settlor executed the amendments of June 30, 1931, to the trust deed and trustee executed the mortgage of the same date to itself to secure the additional advances of $100,587.21. Holmes was consulted in October 1935, shortly before settlor executed the amendment of February 24, 1936, to the trust deed and settlor, Alice, and Gertrude executed the indenture of the same date which provided for the

final settlement of their affairs with defendant. Thompson and Holmes would have been material witnesses. Thompson died on March 24, 1943, more than five years after settlor's death. Holmes died on October 21, 1941, about four years after settlor's death. Because of the death of such key witnesses during the period of the delay, defendant was definitely prejudiced by the delay of Alice and Gertrude in bringing their action. Thompson, in particular, would have been an important witness because, with the approval of settlor, Kenneth, Alice, and Gertrude, he had made a written proposal to trustee to clear the mortgage debt upon practically the same terms that were later agreed to by settlor, Alice and Gertrude in their mentioned indenture of February 24, 1936.

The trial court entered the summary judgment upon the pleadings, affidavits, counter affidavits, and exhibits on file which stated the facts and circumstances recounted in the preceding paragraphs. Those facts and circumstances clearly establish the laches of Alice and Gertrude. The mentioned documents do not show that there is any genuine issue regarding such facts and circumstances.

Also, if the trust had continued notwithstanding the amendment of February 24, 1936, to the trust deed, Lila and Gordon would have had vested remainder interests in the trust upon settlor's death. At the time of settlor's death, Gordon was 22 years old and Lila was three years his senior. For their delay in seeking relief, they gave the same excuses as the excuses given by Alice and Gertrude, which we found to be without merit.

Kempton sought to provide an additional excuse for Lila and Gordon by stating in his affidavit that they "never knew or had any reason to suspect the charges of breach of trust contained in their Amended Complaint until informed thereof by affiant shortly before they filed their original complaint against Bishop Trust Company, Ltd.,

No. 2053, on July 18, 1956; that the recent discovery of the matters alleged in said Amended Complaint by said plaintiffs was by means of intelligence communicated to them by affiant."

H.R.C.P., Rule 56 (e) provides that "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Under the rule, Kempton's statement may not be considered because the portion which stated that Lila and Gordon were unaware of the alleged breaches of trust of trustee was hearsay and the portion which stated that they did not have any reason to suspect such breaches of trust was conclusion. *United States* v. *Britten,* 161 F. 2d 921; *Hartmann* v. *Time, Inc.,* 64 F. Supp. 671; *Seward* v. *Nissen,* 2 F.R.D. 545.

Finally, as far as Kempton, Wilfred, and Gertrude Ann are concerned, they would have had contingent interests in the trust, if the trust had continued despite the last amendment. While there are decisions to the contrary, the prevailing authority appears to recognize the right of a contingent remainderman to sue a trustee for breach of trust. Scott on Trusts, 2d ed., vol. II, § 214. For the purpose of this case, we shall assume that this jurisdiction follows the majority view. Upon such assumption, Wilfred could have sued defendant for the breaches of trust alleged in the amended complaint at any time after November 7, 1939, when he attained the age of majority. His sister and brother could have done so much earlier, for Gertrude Ann became of age on November 24, 1935, and Kempton was of age on July 31, 1937.

Kempton, Wilfred, and Gertrude Ann offered the same excuses for their delay in proceeding against defendant as the other plaintiffs. In addition, Kempton, for himself,

offered the excuse "that he knew nothing about the sale and the consequent depletion of his grandmother's trust, of which the ranch had been a part; that affiant knew nothing of his interest in said trust." This excuse should be considered in the light of Kempton's statement in his affidavit "that family talk had theretofore sometimes turned to the extensive property the family had once owned, including the ranch and the loss thereof many years ago, but that the family, including said affiants and the other plaintiffs in the above entitled cause had accepted the loss as irretrievable and had resigned themselves thereto" and his further statement "that although affiant may have heard of his grandmother's trust and the loss of the trust property in the course of family conversation, he had never heard any question raised as to the possibility of redress."

Thus, Kempton himself shows that earlier "family talk" had put him upon inquiry just as the fact that Alice and Gertrude "seemed hurt about the all-but-forgotten loss of the ranch, upon their return from their visit to the ranch in 1954" made him decide that "he would see what he could unearth," but that he made no earlier inquiry because the family, including himself "had accepted the loss as irretrievable and had resigned themselves thereto." There is nothing in Kempton's affidavit which indicates that defendant placed any obstacle to any inquiry that he might have made.

In the circumstance, Kempton may not avoid laches on the ground that he did not know about the trust or about the activities of trustee and defendant in connection with the trust. The law on this point is stated in 19 Am. Jur., *Equity,* § 505, as follows: "Knowledge of the conduct giving rise to the complainant's cause of action may be imputed to the complainant by reason of an opportunity to acquire knowledge or because of circum-

stances of which he was cognizant, such as obvious and unconcealed activities affecting the property in dispute. He will be charged with knowledge where the evidence leads to the conclusion that he could have informed himself of the facts by the degree of 'diligence' which the law exacts—described as 'reasonable' diligence—or where circumstances of which he was cognizant were such as to put a man of 'ordinary' prudence on inquiry."

Affirmed.

*Brahan Houston* (also on the briefs) for appellants.

*Gilbert E. Cox* (*Smith, Wild, Beebe & Cades* with him on the brief) for appellee.