CARL C. ADAIR, Successor Trustee in Dissolution of KONA CORPORATION, a Dissolved Hawaii Corporation, Plaintiff, *v.* EDWARD C. HUSTACE, Trustee, et al., Defendants, and HANNAH REEVES, et al., Defendants, Cross-Claimants, Appellants, Cross-Appellees, *v.* FOOTHILL LAND CORPORATION, et al., Defendants, Cross-Defendants, Appellees, Cross-Appellants, and EDWARD C. HUSTACE, Trustee, Defendant, Appellee

NO. 6589

CIVIL NO. 3588

FEBRUARY 9, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR
ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY RICHARDSON, C.J.

These are appeals of final judgment on a cross-claim to cancel a deed. Cross-claimants allege that the deed was procured from the grantor, their ancestor, by the fraud of cross-defendants' predecessor-in-title. In a special verdict on written interrogatories, a jury found that the deed was procured by fraud, but that cross-claimants' action was barred by the statute of limitations, laches, estoppel and adverse possession. Judgment was entered for cross-defendants, from which judgment both parties appeal. We affirm.

I.

In 1936, Elizabeth P. Solomon owned a 79.89-acre parcel of land in Awalua-Ohiki, District of North Kona, County of Hawaii. Solomon's family had owned the parcel since the original land patent grant in 1915. They had not resided on the land, but had homesteaded it for various periods each year.

The parcel is located in an area long ranched by Huehue Ranch. In the late 1920s and early 1930s, a series of earthquakes and a fire changed the character of the parcel to low quality ranchland and made it accessible to grazing by cattle of that ranch.

Solomon's daughter, Mary Dunaway, testified that in 1935 Akina Ahana, Solomon's mother and then owner of the parcel, went to see Arthur J. Stillman about leasing the land to the ranch for cattle grazing. Stillman was married to Aileen Maguire, then sole income beneficiary of a testamentary trust created by the will of her grandfather, John A. Maguire, the corpus of which trust consisted largely of the ranch.

According to Dunaway, at that meeting Ahana and Stillman

entered into an oral lease of the property for six months for $100. The lease was to be embodied in writing at a later date.

Ahana died in December 1935. Dunaway testified that just prior to Ahana's death, Ahana told Solomon that if Solomon chose to continue the lease, she should get it in writing.

In July 1936, Dunaway further testified, Solomon and her husband, Thomas, signed what they thought was a continuing lease of the property to Stillman and/or Huehue Ranch at $100/six months. The document was in fact a deed of the property from the Solomons to the John A. Maguire Estate, Ltd.[1] The consideration recited was $100.[2] There is no dispute that the signatures on the deed are those of Elizabeth and Thomas Solomon. The deed was witnessed by Stillman and a notary public. Both Solomons, Stillman and the notary public are deceased. The deed was recorded in 1941.

Record title to the parcel devolved thereafter from the John A. Maguire Estate, Ltd. through others to the present owners of the ranch, who are the primary cross-defendants here. They are stipulated to be bona fide purchasers with respect to cross-claimants' claim.

Since 1936, the ranch has used the parcel as part of a larger area of about 600 acres for minimal cattle grazing. Improvements have consisted of some fencing, clearing and weed poisoning, and construction of a small holding pen.

No lease rent has ever been paid to Solomon and/or her heirs by Stillman and/or Huehue Ranch. No demand for such rent or any other claim regarding the land has ever been made by Solomon and/or her descendants. There has been no communication concerning the parcel between the respective parties or between their successors since 1936. There is no evidence that Ahana, Solomon or any of their heirs have used the property since at least 1935.

State tax records reflect that real property taxes on the property

---

[1] The John A. Maguire Estate, Ltd. was a corporation formed in 1913 by Maguire and others.

[2] At trial, cross-claimants, in an effort to demonstrate gross inadequacy of consideration sufficient to infer fraud, offered the testimony of a real estate appraiser that the parcel was worth $20/acre in 1936, or approximately $1,800 for the whole parcel. Cross-defendants countered with evidence that the State of Hawaii valued the land in 1944 for real property tax purposes at $133 for the whole parcel, and that Huehue Ranch valued the land in 1955 at $1/acre.

were paid by "Akina Ahana" through 1941. (Ahana having died in 1935, the taxes were actually paid by Solomon.) Since 1941, the year in which the 1936 conveyance was recorded, taxes have been paid by the respective record title holders. Dunaway testified that in 1945 Solomon told her that the tax bill on the property had stopped coming. She responded: "I just told her . . . maybe it will keep on coming. You know. Because if you've been paying taxes for awhile, I think it will keep on coming . . . sometimes taxes are like that." She testified that she was suspicious because the bill had stopped coming, but didn't follow through because of an unwillingness to interfere with her mother's affairs. Dunaway was, however, aware of the real property tax scheme because she had had property tax problems of her own.

Solomon died in 1955. One of Solomon's sons testified that family members discussed at that time "what was left, or what she had." However, there is no testimony that the status of the parcel was discussed then, despite the fact that Solomon had earlier told at least one family member of her belief that she continued to own the parcel.

Another of Solomon's sons, Herman Kunewa, was appointed administrator of Solomon's estate in 1965. In his October 1967 estate inventory, he did not list the parcel as an asset. When asked why not, he testified that while his mother had once, in 1945, told him of what she believed to be her ownership of the property, he did not find any deeds or other proof of such ownership and had forgotten the conversation by the time of the inventory. He did not consult with any family member in preparing the inventory.

On December 2, 1974, Carl C. Adair, as trustee in dissolution of the Kona Corporation, a dissolved Hawaii corporation, brought an action to quiet title to Huehue Ranch. On June 13, 1975, the trial court dismissed the complaint in toto under principles of res judicata.[3] No appeal therefrom was taken.

---

[3] Adair and Kona Corporation had purchased the ranch in 1962 from its then owner, Edward C. Hustace as trustee of the Stillman Trust. When the purchasers defaulted on mortgage payments, Hustace foreclosed and repossessed the ranch. Certain claims by Adair and Kona Corporation arising out of the transaction were addressed by this court in two separate appeals: Adair v. Kona Corp., 51 Haw. 104, 452 P.2d 449 (1969); and Adair v. Hustace, 55 Haw. 445, 521 P.2d 869 (1974). These decisions were held by the trial court to have res judicata effect on Adair's quiet title action.

Prior to such dismissal, Adair published notice of the action in a newspaper of general circulation in the County of Hawaii. The notice included a list of affected parcels by tax map key number, location description, patent grant number and acreage.

Hannah Reeves, Elizabeth Solomon's granddaughter, testified that she read the notice and recognized the listing of the parcel in question because of its acreage and location. She went to the Bureau of Conveyances in Honolulu and located the 1936 conveyance from Solomon to the Maguire Estate. When informed by her attorney that the document was in fact a deed, she checked with certain family members, none of whom had any knowledge of such a conveyance.

On April 14, 1975, Reeves and the other heirs at law of Elizabeth Solomon answered the quiet title action and cross-claimed against the present record title holders and related others for cancellation of the 1936 deed on the ground that it was fraudulently procured. The cross-claim survived dismissal of the quiet title action and is the subject of this appeal.

Cross-defendants answered, denying that the deed was fraudulently procured and arguing that even if it was, cross-claimants' claim was precluded by operation of the statute of limitations and the doctrines of equitable estoppel, laches, and adverse possession. They later moved for summary judgment on the above issues and on the additional argument that such an action may not be maintained against bona fide purchasers. The motion was denied.

A jury trial was had. At its conclusion, the jury returned a special verdict on written interrogatories, as follows:

1. Was the deed from Mr. & Mrs. Arthur [sic] Solomon obtained by fraud? [Jury answer:] Yes.

2. If your answer to question #1 is "no", you shall not answer the remaining questions but shall notify the bailiff that you have reached a verdict. If your answer to question #1 is "yes", you shall answer all of the remaining questions.

3. As to the statute of limitations defense, did the claimants discover or should they have discovered the fraud before April 14, 1969? Yes.

4. Do you find that the defense of laches was proven? Yes.

5. Do you find that the defense of adverse possession was proven? Yes.

6. Do you find that the defense of estoppel was proven? Yes.

Accordingly, judgment was entered for cross-defendants. Both cross-claimants and the cross-defendant record owners appeal therefrom.

## II.

These appeals present us with a number of questions. We have carefully considered all issues presented, but consider the following to be dispositive:

(1) Under what circumstances, if any, will the doctrine of laches preclude an action to cancel a deed for fraud?

(2) Was the jury properly instructed on application of the doctrine of laches, and, if so, was there substantial evidence to support its finding of laches.[4]

## III.

The doctrine of laches reflects the equitable maxim that "equity aids the vigilant, not those who slumber on their rights." 2 S. Symons, *Pomeroy's Equity Jurisprudence* § 418 (5th ed. 1941).[5] Where

---

[4] We consider briefly another issue. Cross-defendants argue that irrespective of defenses such as laches, an action to cancel a deed for fraud may not be maintained against a bona fide purchaser. The question is not dispositive here because, as discussed more fully below, we hold that in any event laches could preclude and was properly applied to preclude consideration of this action. But we do note our opinion that an action to cancel a deed for fraud may be maintained against a true bona fide purchaser if the alleged fraud is fraud in the factum, but not if it is fraud in the inducement. Fraud in the factum is fraud which goes to the nature of the document itself. *See* H. Dobbs, *Remedies* § 9.6 at 646 (1973). Fraud in the inducement is fraud which "induces the transaction by misrepresentation of motivating factors [such as] value, or extent, usefulness, age, or other characteristic of [the] property." *Id.* at 645. This approach, we believe, is consistent with our decision in Gonsalves v. Ikei, 47 Haw. 145, 384 P.2d 300 (1963), in which we upheld denial of a grantee's action for specific performance of conveyance documents to which grantor's signature was procured by a third party's misrepresentation of the document's nature. *See id.* at 147, 384 P.2d at 302-03.

[5] "Indeed, in some of . . . [the maxim's] applications it may properly be regarded as a special form of the yet more general principle, He who seeks equity must do equity." *Id.*

applicable, it acts to bar a court from considering an equitable action such as for cancellation because of a perception that it is more equitable to defendants and important to society to promote claimant diligence, discourage delay and prevent the enforcement of stale claims. *Id.*

There are two components to laches, both of which must exist before the doctrine will apply. First, there must have been a delay by the plaintiff in bringing his claim, and that delay must have been unreasonable under the circumstances. W. McClintock, *Equity* § 528 at 71 (2d ed. 1948). Delay is reasonable if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him. 3 S. Symons, *Pomeroy's Equity Jurisprudence, supra* at § 917. Second, that delay must have resulted in prejudice to defendant. McClintock, *Equity, supra* at 72. Common but by no means exclusive examples of such prejudice are loss of evidence with which to contest plaintiff's claims, including the fading memories or deaths of material witnesses, changes in the value of the subject matter, changes in defendant's position, and intervening rights of third parties. *Id.*

As noted by the United States Supreme Court in *Patterson v. Hewitt,* 195 U.S. 309, 317 (1904), "[s]ome degree of diligence in bringing suit is required under all systems of jurisprudence." Just as the statute of limitations establishes the requisite degree for actions at law, so is laches the rule for equitable actions. But a major difference between the statute of limitations and laches is the flexibility of the latter. "The statute of limitations consorts with the rigid principles of the common law, but is ill adapted to the flexible remedies of a court of equity." *Id.* As a result, while "[i]n actions at law, the question of diligence is determined by the words of the statute . . . [i]n suits in equity the question is determined by the circumstances of each particular case." *Id.*[6]

---

[6] Appellants assert that the trial court erred in applying the statute of limitations for personal actions, HRS § 657-1 (1976), rather than that for real actions, HRS § 657-31 (1976). This being an equitable action, the more immediate question is whether either statute applies. "Originally statutes of limitations had no application to proceedings in equity, but the time for bringing suit was controlled solely by the judicially imposed doctrine of laches." Note, *Developments in the Law: Statutes of Limitations,* 63 Harv. L. Rev. 1177, 1183 (1949-50). We need not reach the question whether the merger of law and equity has in this jurisdiction made either statute

In this regard, cross-claimants argue that where the basis of a claim is fraud or breach of a confidential relationship, laches should not operate until after a claimant has *actual* knowledge of the claim, as opposed to knowledge of facts and circumstances sufficient to impute his knowledge of the claim. This proposal is untenable, for two basic reasons. First, it is wholly inconsistent with the maintenance of laches' flexibility. Second, the goal of promoting diligence in the prosecution of claims would not be advanced if a claimant were not chargeable with laches where he knew of facts and circumstances from which he should have concluded that a claim might exist, yet took no further steps. We therefore decline to adopt this proposal.[7]

We have applied the principles discussed above on a number of occasions. For example, *In re Kealiiahonui,* 9 Haw. 1 (1893) involved a petition to revoke an order admitting a will to probate on the ground of newly discovered fraud and forgery in production of the will. This court noted that "[t]he right of the party defrauded to have the transaction set aside is not affected by lapse of time so long as he remains *without any fault of his own* in ignorance of the fraud which has been committed." *Id.* at 5 (emphasis added).

In the case of *In re Nelson,* 26 Haw. 809 (1923), land was conveyed to petitioner's grandfather in trust for petitioner's support until her majority, at which time it was to be conveyed to her in fee. This deed of trust was recorded. A year later, petitioner's grandfather con-

---

applicable to actions to cancel fraudulent instruments, since we agree that even if either is applicable, the doctrine of laches may preclude an equitable action brought within the applicable statutory period. "[W]here the statute is in terms applicable to suits in equity, as well as at law, it is ordinarily construed, in cases demanding equitable relief, as fixing a time beyond which the suit will not under any circumstances lie, but not as precluding the defense of laches, provided there has been unreasonable delay within the time limited by the statute." Patterson v. Hewitt, *supra* at 318. *See generally* McClintock, *Equity, supra* at 74-75.

[7] This is not to say that the nature of the claim or the situation of the allegedly dilatory party is not relevant to the question whether laches applies. On the contrary, since laches particularly depends on the facts and circumstances of each case, such facts are highly relevant. Thus, all other aspects being equal, the fact that parties stood in confidential or fiduciary relationships to one another would normally appear to make knowledge of a claim by one against the other less easily imputable than if such a relationship did not exist. The same is true of an action for fraud where the very nature of the claim is defendant's denial to plaintiff of knowledge of the claim. However, such cases are best decided on their particular facts.

veyed the land to another trustee under similar provisions for her support, but only for her life. The land was not conveyed to petitioner pursuant to the first deed of trust upon her majority six years later. She did not sue to effectuate the conveyance until 24 years thereafter. Nevertheless, laches was held not to apply since petitioner had neither actual *nor* constructive notice of the terms of the first deed.[8] *Id.* at 818, 820. This court noted especially that no third party rights, including those of innocent purchasers, had intervened. *Id.* at 821.

Finally, in *Brown v. Bishop Trust Co.*, 44 Haw. 385, 355 P.2d 179 (1960), a settlor created two trusts in 1921 and 1927, respectively, the corpora of which were certain lands she owned. The trustee sold the lands and otherwise managed the trust in such a way as plaintiffs later alleged was a breach of trust and a fraud upon settlor and beneficiaries. Plaintiffs were contingent remaindermen of the trust until 1937, when their remainder interests vested upon the settlor's death. Though they could have then sued the trustee for the alleged breaches, they did not do so until 1955. Defendant's motion for summary judgment on the issue of plaintiff's laches was granted, and this court affirmed. We noted that though the plaintiffs did not know of the trustee's legal liability, "there were enough facts staring them in the face to put them upon inquiry." *Id.* at 397, 355 P.2d at 185. These included "family talk" about the fate of the trust lands. *Id.* at 402, 355 P.2d at 187. We also noted that certain key witnesses had died during the delay, witnesses who could have aided the defense and whose absence was therefore prejudicial to defendants. *Id.* at 400, 355 P.2d at 186.[9]

Cross-claimants also argue that the application of laches to defeat their claim of fraud would allow perpetuation of the fraud found by

---

[8] Regarding the effect of recording the first deed of trust upon petitioner's knowledge of its terms, this court noted that "the recording of a deed is notice . . . merely to those who are bound to search the record. Under the circumstances of this case [petitioner] was not bound to search the record . . . . There are no . . . facts or circumstances . . . which would charge her with the duty of searching for information [on the existence of terms of the first deed of trust]." *Id.* at 820.

[9] See also: Magoon v. Lord-Young Engineering Co., 22 Haw. 327, 349-50 (1914); Ulrich v. Hite, 35 Haw. 158, 182-85 (1939); Poka v. Holi, 44 Haw. 464, 474-82, 357 P.2d 100, 106-10 (1960) and Anderson v. Anderson, 59 Haw. 575, 590, 585 P.2d 938, 947 (1978).

the jury. This court will strive to provide a suitable remedy for an adequately proven fraud. But laches is not properly applied solely to preclude an equitable remedy for fraud. Rather, laches precludes the very consideration of an equitable action because the prejudice to defendant caused by plaintiff's unreasonable delay consists in part of placing the defendant at an inequitable disadvantage in meeting plaintiff's allegations. Thus, in a case such as this, laches does not operate to penalize a plaintiff by foreclosing a remedy for an actual fraud. Instead, it prevents the plaintiff from bringing the cancellation action itself.

Considering the above, we have no doubt that laches may preclude an action to cancel a deed for fraud under appropriate circumstances. We therefore turn to the questions whether the jury was properly instructed on the issue of laches and, if so, whether its finding of laches is supported by substantial evidence.

In considering the adequacy of instructions, we look to whether, taken as a whole, they correctly declare applicable law. *E.g.*, *Kometani v. Heath*, 50 Haw. 89, 93-94, 431 P.2d 931, 935 (1967). Furthermore, "[t]he question on review of instructions is not whether they were technically correct but whether appellant could have suffered prejudice on their account." *In re Estate of Lorenzo*, 61 Haw. 236, 244, 602 P.2d 521, 528 (1979). We have reviewed the instructions given by the trial court on laches,[10] and cannot conclude that, in the

---

[10] The jury was instructed as follows:

Equitable relief will be refused when, during inexcusable delay, the evidence has become obscured and, under the circumstances of the case, it is too late to ascertain the merits of the controversy.

This rule particularly applies when some or all of the parties to the contract have died.

The question of laches does not depend, as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, claimant is chargeable with a want of due diligence in failing to institute proceedings before he did.

The means of knowledge are ordinarily the equivalent in law to knowledge.

So, if it appears from the evidence in the case that a person had information which would lead a reasonably prudent person to make inquiry through which he would surely learn certain facts, then this person may be found to have had actual knowledge of those facts, the same as if he had made such inquiry and had actually learned such facts.

That is to say, the law will charge a person with notice and knowledge of whatever he would have learned, upon making such inquiry as it would have been

context of this particular case, they were incorrect or prejudicial to cross-claimants.

Finally, we will not disturb an otherwise proper jury verdict if it is supported by substantial evidence. *E.g., Ashford v. Thos. Cook & Son*, 52 Haw. 113, 123, 471 P.2d 530, 536 (1970). This appears particularly true concerning laches, dependent as that doctrine is on the facts and circumstances of each case. We therefore next consider whether there is substantial evidence to support the jury's finding of laches in this case.

Certainly there is substantial evidence of delay. Thirty-nine years passed from occurrence of the alleged fraud to initiation of this action.

There is also substantial evidence that such delay was attributable to a lack of reasonable diligence by cross-claimants and their predecessor in ascertaining and prosecuting this claim. Because of the very nature of fraud and because there is no evidence that cross-claimants had *actual* knowledge of the claim until shortly before it was brought, we reach this conclusion only after a careful scrutiny of the record. Nevertheless, the record does evidence facts and circumstances from which a jury could properly impute knowledge of the claim to cross-claimants such that their failure to bring this action sooner was unreasonable. For example, the real property tax bill stopped coming in 1941, yet neither Elizabeth Solomon nor her daughter, Mary Dunaway, both of whom knew of this fact, wrote to the tax office to ask why. Cross-claimants alleged that the 1936 transaction was intended only as a continuing lease at $100/six months, yet no lease rent was ever paid to Solomon or cross-claimants, and Solomon or cross-claimants never demanded such payment. Upon Solomon's death in 1955, the property was not included in the inventory of her estate. The cross-claimant who undertook the inventory did not investigate the status of the parcel despite his having been told by Solomon earlier that she owned the parcel. He also did not ask other family members whether Solomon

---

reasonable to expect him to make under the circumstances.

Knowledge or notice may also be established by circumstantial evidence.

If it appears that a certain condition has existed for a substantial period of time, and that the persons had regular opportunities to observe the condition, then you may draw the inference that he had knowledge of the condition.

owned any property other than those to which she had deeds in her possession at the time of her death.[11]

Finally, there is support in the record for a finding of resulting prejudice to cross-defendants. Two facts stand out. First, during the delay a bona fide purchaser bought the parcel. Second, during the delay all four witnesses to the 1936 transaction died.[12] Other examples are the difficulty in appraising the parcel's 1936 value, the change in the value of the land between 1936 and 1974, and the evident difficulty of several witnesses in recalling pertinent events.

There is substantial evidence of significant delay in prosecution of this action, of a lack of reasonable diligence by cross-claimants in such prosecution, and of resulting prejudice to cross-defendants. We will not disturb the jury's finding of laches.

### IV.

In conclusion, we hold that the doctrine of laches could properly operate to preclude cross-claimant's claim, that the jury was adequately instructed on application of the doctrine, and that the jury's finding was supported by substantial evidence. The judgment is affirmed.

*Lawrence W. Cohn* for defendants, cross-claimants, appellants, cross-appellees Hannah Reeves, et al.

*Paul A. Lynch* and *William W. C. Yuen (Case, Kay, Clause & Lynch* of counsel) for defendants, cross-defendants, appellees, cross-appellants Foothill Land Corp., et al.

*Michael W. Gibson (Ashford & Wriston* of counsel) for defendant, appellee Edward C. Hustace.

---

[11] We imply neither that this was in fact the evidence upon which the jury based its conclusion, nor that, if it was, it was the exclusive evidence. There was other objective evidence. There was also the jury's assessment of the credibility of witnesses, which we cannot review. We note only that the presence of such evidence precludes us from concluding that the jury erroneously found a lack of reasonable diligence.

[12] The prejudice in such a situation might arise from the fact that alleged fraud is sought to be proven solely on the basis of admissible hearsay testimony; a defendant is required to defend against the allegation of fraud not by the testimony of his own witnesses to the transaction, but solely by impeaching the credibility of the witness relating the hearsay.