985 P.2d 1089

Angelo PELOSI, Plaintiff/Counterclaim Defendant–Appellant,

v.

WAILEA RANCH ESTATES, a Hawai'i general partnership, John Kean, Stephen Pitt, Satish Gholkar, Eduardo F. Bello, Hugh Jeffrey Farrington, Stephen K. Rink, Tina Sohn, individually and as Personal Representative of the Estate of Robert C. Sohn, Deceased, Defendants–Appellees,

and

No. 20254.

Intermediate Court of Appeals of Hawai'i.

Feb. 10, 1999.

Certiorari Granted April 7, 1999.

Kevin H.S. Yuen (Law office of Kevin H.S. Yuen, of counsel); Edward F. Mason *, on the briefs, Wailuku, for plaintiff/counterclaim defendant-appellant.

Gary Robert, on the brief, Lahaina, for defendants/counterclaimants- appellees, except Tina Sohn.

Wilson M.N. Loo and Steven B. Jacobson (Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington, of counsel) Honolulu, for Tina Sohn, individually and as Personal Representative of the Estate of Robert C. Sohn, Deceased.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

The primary issue in this appeal is whether Plaintiff/Counterclaim Defendant–Appellant Angelo Pelosi (Pelosi) is entitled to a mandatory injunction requiring the removal

* Edward F. Mason is deceased, having died on      October 11, 1997.

of a roadway and tennis court that were constructed on Lot 29 of the Maui Meadows III (MM III) Subdivision, in clear violation of an MM III restrictive covenant prohibiting the lot from being used "except for residential purposes." The Second Circuit Court (circuit court) answered the foregoing question in the negative and also declined, in the exercise of its discretion, to order removal of the roadway and tennis court.

We conclude that the circuit court should have issued an injunction, ordering removal of the tennis court. However, due to Pelosi's laches in bringing the action to enforce the covenant as to the roadway, Pelosi is not entitled to a mandatory injunction to remove the roadway. Moreover, the circuit court did not abuse its discretion when it balanced the equities and declined to order removal of the roadway.

## BACKGROUND

### A. *Pelosi I*

This case has previously been before this court. In *Pelosi v. Wailea Ranch Estates* (*Pelosi I*), 10 Haw.App. 424, 876 P.2d 1320, *reconsideration denied*, 10 Haw.App. 631, 879 P.2d 591, *cert. denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994), we concluded that (1) the restrictive covenant at issue clearly and unambiguously required that "only one single-family dwelling and such buildings as are strictly accessory to the use of that dwelling may be constructed on an MM III houselot," *id.* at 437, 876 P.2d at 1327; (2) the restrictive covenant was clearly violated when Defendant–Appellee Wailea Ranch Estates, a general partnership whose partners were Defendants–Appellees John Kean (Kean), Stephen Pitt (Pitt), Satish Gholkar (Gholkar), Eduardo F. Bello (Bello), Hugh Jeffrey Farrington (Farrington), and Stephen K. Rink (Rink) (the partnership and partners will hereinafter be collectively referred to as "the WRE Defendants"), constructed across Lot 29 of the MM III Subdivision, a tennis court and roadway which were accessory to residences in a completely different subdivision, the WRE Subdivision, *id.* at 441, 876 P.2d at 1329; and (3) the circuit court was wrong when it refused to enter a declaratory judgment that the WRE Defendants and the individual Defendants/Counterclaimants–Appellees [1] (Individual Defendants) (collectively, Defendants) "had breached the MM III Covenants because they were not using Lot 29 for residential purposes[.]" *Id.* at 433, 876 P.2d at 1325.

In *Pelosi I*, we remanded the case to the circuit court, with instructions that it determine whether Pelosi, the owner of MM III Lot 28, the houselot adjoining Lot 29, was entitled to a mandatory injunction to remove the violation of the restrictive covenant. *Id.* at 446, 876 P.2d at 1331. More specifically, we instructed:

> If the [circuit] court determines that Defendants deliberately and intentionally violated the MM III Covenants or intentionally assumed the risk of such violation, a mandatory injunction should issue forthwith, ordering Defendants to remove the roadway and tennis court on Lot 29.
>
> If, on the other hand, the [circuit] court determines that Defendants did not inten-

---

1. The named Individual Defendants/Counterclaimants–Appellees at the time we issued our decision in *Pelosi v. Wailea Ranch Estates* (*Pelosi I*), 10 Haw.App. 424, 876 P.2d 1320, *reconsideration denied*, 10 Haw.App. 631, 879 P.2d 591, *cert. denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994), were Stephen M. Swanson, Louise S. Swanson, Margaret S. Smith, Batte T. L. Smith, Nahbut L. Smith, Peter Tucker, Lynne Coleman Tucker, Marc O. Yoshizumi, Davis Roland King, Dorían Keyes King, Dennis Rush, Cindy Rush, O'Green Estate, Bob Oosterveen, Jane Greenspun, Ronald G. Mann, Edna Joan Mann, Stephen Fowler Chadwick, Annice Bucker Chadwick, Gerald K. Wong, and Chu Il Wong.

Subsequently, on remand, Defendants–Appellees Tina Sohn (Tina) and Robert C. Sohn (Rob-

ert) (collectively, the Sohns), who had purchased four lots in the Wailea Ranch Estates (WRE) Subdivision from prior owners, were joined as additional defendants for "any and all injunctive relief claims involving their interest in the subject Lot 29." R.A. v.5 at 1107–08. Consequently, any reference to "Individual Defendants" in this opinion also includes the Sohns. Although the Sohns were served with copies of pertinent pleadings filed in this action, they never filed an answer to the complaint or entered an appearance before the circuit court because, according to Tina, by the time they were served with the pleadings, the circuit court had already denied Pelosi any injunctive relief. Robert subsequently died, and Tina, as administrator of Robert's estate, was substituted as a party to this appeal.

tionally violate the MM III Covenants or intentionally assume the risk of such violation, then the [circuit] court may balance the equities in determining whether to grant injunctive relief by ordering removal of the roadway and/or tennis court. If the [circuit] court concludes that the relative hardships to the parties preclude an award of injunctive relief, then the [circuit] court shall hold a hearing to determine whether [Pelosi] is entitled to damages resulting from Defendants' breach of the MM III Covenants which are in addition to the $20,000 in damages already awarded to him for his nuisance cause of action.

*Id.*

### B. *Pelosi II*

On remand following our decision in *Pelosi I*, Pelosi filed a motion for entry of mandatory injunction "based upon the trial transcript and the exhibits admitted in evidence at the trial." Following a hearing on Pelosi's motion on July 14, 1995, the circuit court, on August 24, 1995, entered its "Findings on Issues Submitted by the Intermediate Court of Appeals," "Conclusions of Law," and "Order" (August 24, 1995 Order on Remand). The court found and determined as follows:

Question No. 1. Whether defendant deliberately and intentionally violated MM III Covenants? **No.**

Question No. 2. Whether defendant intentionally assumed the risk of such violation? **No.**

Question No. 3. In balancing the equities should the court grant injunctive relief by ordering removal of the roadway and/or tennis court? **No.**

Question No. 4. What, if any, damages should be assessed the defendants? **Further hearing is necessary.**

The pertinent facts of this case reflect that:

1) the County of Maui approved the consolidation of Lot 29 with twenty (20) adjacent acres which became the Wailea Ranch Estates upon purchase by defendant developers.

2) The County of Maui approved the Wailea Ranch Estates subdivision to include the construction of a road and tennis court upon Lot 29.

3) Without Lot 29 as access to the subdivision, no approval could have been given by the County.

4) No other access is available and by necessity, Lot 29 was included as part of the subdivision.

5) Defendants purchased the property with subdivision and development as their purpose and would have had no reason to do so if no subdivision or development were possible or permissible.

6) County and state laws do not prohibit roads or tennis courts from being built in rural subdivisions.

7) The County of Maui had no objection to and indeed permitted the construction of a tennis court and road on Lot 29.

8) Roads and tennis courts exist in the Maui Meadows subdivision. Although the restrictive covenants are not County or state laws and are to be considered separately and individually, considering the milieu of governmental regulations, real estate practice, construction and comparable uses, defendants' decision to proceed with a tennis court and road on Lot 29 cannot be found to have been deliberate and intentional violations of the MM III Covenants.

9) Indeed, it would appear that the defendants' expertise in law, construction, real estate development, and architecture gave credence to their conclusion as to the proper interpretation of the restrictive covenants and not necessarily that they knew or should have known better.

10) The finding of a jury of their peers that the defendants were not using Lot 29 for residential purposes would seem to have confirmed the defendants' and their experts' opinions in interpreting the use of Lot 29.

11) Plaintiff is himself well educated, [and] experienced and practicing real estate person, and was living adjacent to the defendants [sic] development with a clear observation as to the progress of the construction. He had the opportunity to determine from the instigation of the defendants [sic] plans in 1986 whether to involve

himself but expressed no objections until the spring of 1988. Even if plaintiff's version were accepted, construction on Lot 29 was substantially completed by July 1987 way before plaintiff alleges he met with defendants in late 1987 and warned defendants.

12) Since 1986, development has not been enjoined or delayed and additional party defendants have been added who have purchased lots and/or built upon them. The Wailea Ranch Estates may no longer exist as the original entity it once was.

13) Subjecting the defendants as well as subsequent innocent purchasers to the injunctive relief sought by plaintiff would create substantial hardship on their part by effectively terminating access to the subdivision and thereby creating an illegal subdivision.

14) The facts presented at trial regarding damages suffered by plaintiff resulted in an award of $20,000 for nuisance. Further hearing and briefing are required for any additional argument for damages.

15) The issues submitted to this [c]ourt by the Intermediate Court of Appeals do not include a resolution of zoning and land use practices or matters by the defendants and have not heretofore been considered nor will they for purposes of this decision.

### CONCLUSIONS OF LAW

1) Since defendants did not deliberately or intentionally violate MM III Covenants, injunctive relief is not appropriate.

2) Since defendants did not assume the risk of violating the MM III Covenants, injunctive relief is not appropriate.

3) Since in balancing the equities, the injunctive relief of removal of the road and/or tennis court would not serve justice, injunctive relief is not appropriate.

4) A hearing on damages resulting from defendants' breach of the MM III Covenants in addition to the $20,000 already awarded for nuisance is warranted.

On September 5, 1995, Pelosi filed a motion to vacate the circuit court's August 24, 1995 Order on Remand. The motion was denied by the circuit court on November 22, 1995.

On October 27, 1995, Pelosi, believing that the circuit court should have allowed him to produce additional testimony before "balancing the equities" and deciding whether to award him injunctive relief or damages, filed a "Motion for Additional Testimony on the Issue of Access." In support of his motion, Pelosi attached the affidavit of a licensed professional engineer who stated that an existing fire break road could be upgraded to provide access to the WRE Subdivision. This motion was denied by the circuit court pursuant to an order dated November 24, 1995.

On April 18, 1996, the circuit court conducted a hearing to determine what damages, if any, should be awarded to Pelosi for WRE's breach of the MM III Covenants. At the hearing, the circuit court limited the evidence to that in "regards to diminution in value and loss of economic use" of Pelosi's property as a result of WRE's breach of the MM III Covenants. The circuit court reasoned that because it had ruled that "there was no deliberate or intentional breach of the covenants, the court is kind of bound by its previous ruling, and accordingly[,]" the evidence presented at the hearing would have to be limited as such.

On June 25, 1996, the circuit court entered "Findings of Fact [FsOF] and Conclusions of Law [CsOL]," as well as a Judgment which, consistent with our instructions in *Pelosi I*, found and declared that "Defendants are in breach of the [MM III] Declaration of Restrictive Covenants date [sic] November 5, 1971 because Defendants are not using Lot 29 of the [MM III] Subdivision ... for residential purposes." The Judgment also awarded Pelosi two dollars in "nominal damages" and ordered that Pelosi be reimbursed the sum of $16,770 for attorney fees and costs previously paid to Defendants, together with interest thereon, from April 30, 1991 at the rate of ten percent (10%) per annum.

On July 5, 1996, Pelosi filed a "Motion to Amend, Vacate or Reconsider [the June 25, 1996 FsOF and CsOL and] to Vacate Judgment and/or for New Trial." On September 27, 1996, the circuit court denied Pelosi's

motion and entered an "Amended Judgment" that consolidated the circuit court's previous rulings into a final judgment.

On October 8, 1996, Pelosi filed a "Motion to Alter 'Amended Judgment' Entered September 27, 1996," pointing out that the September 27, 1996 Amended Judgment did not meet the requirements of finality under Hawai'i Rules of Civil Procedure (HRCP) Rule 58 and the guidelines set forth by the Hawai'i Supreme Court in *Jenkins v. Cades*, 76 Hawai'i 115, 869 P.2d 1334 (1994). On October 28, 1996, Pelosi filed his notice of appeal, and on November 25, 1996, the circuit court granted Pelosi's October 8, 1996 Motion to Alter Amended Judgment and entered a Post–Appeal Judgment. Pelosi filed an Amended Notice of Appeal on December 19, 1996.

## ISSUES ON APPEAL

Pelosi contends that (1) the circuit court wrongly determined that he was not entitled to a mandatory injunction requiring the removal of the tennis court and roadway from Lot 29; (2) the circuit court abused its discretion when it balanced the equities and denied him injunctive relief, without first allowing him to adduce testimony on whether an alternative access to WRE Subdivision was available; (3) FsOF Nos. 3, 4, 5, 7, 8, 9, 10, 11, 12, and 13 were clearly erroneous; and (4) CsOL Nos. 1, 2, and 3 were wrong. Pelosi has not appealed the circuit court's award of two dollars in nominal damages.

## DISCUSSION

A. *Whether Pelosi Established His Entitlement to Mandatory Injunctive Relief*

In *Pelosi I*, we specifically instructed the circuit court to apply the principles set forth in *Sandstrom v. Larsen*, 59 Haw. 491, 583 P.2d 971 (1978), in determining whether Pelosi was entitled to a mandatory injunction to remove the roadway and tennis court on Lot 29. 10 Haw.App. at 446, 876 P.2d at 1331. In *Sandstrom*, the Hawai'i Supreme Court held that

> where a property owner "deliberately and intentionally violates a valid express re-striction running with the land *or intentionally 'takes a chance,'* the appropriate remedy is a mandatory injunction to eradicate the violation."

59 Haw. at 500, 583 P.2d at 978 (emphasis in original) (quoting *Peters v. Davis*, 426 Pa. 231, 231 A.2d 748, 752 (1967)). The supreme court explained that in such a situation, a plaintiff is entitled to mandatory injunctive relief "without the necessity of consideration by the [trial court] of the relative hardship between the parties," *id.*, "regardless of the relative damage which may ensue from the injunction" *id.* at 501, 583 P.2d at 979, and "even absent a showing of the amount of damage which has in fact been caused by that breach." *Id.* (citations omitted). Moreover, embracing the holding of the Vermont Supreme Court in *McDonough v. W.W. Snow Constr. Co.*, 131 Vt. 436, 306 A.2d 119 (1973), the supreme court held that where a defendant landowner "actually *or* constructively knew of the [land use] restriction" and yet proceeded with a construction project in violation of the restriction "without first obtaining a resolution of the covenant," the defendant "acted at its own peril," for " 'he who takes land *with notice* of such a restriction will not in equity and good conscience be permitted to act in violation of the restriction.' " *Sandstrom*, 59 Haw. at 499, 583 P.2d at 978 (emphases added) (quoting *McDonough* ).

More recently, in *Fong v. Hashimoto*, No. 19424, slip op. at 50, 1998 WL 71951, —— Hawai'i ——, ——, —— P.2d ——, —— (App. February 20, 1998), *cert. granted* (April 2, 1998), this court was called upon to determine whether a mandatory injunction should have been granted, requiring the defendant landowners to remove portions of any structure on their lot which violated a one-story, fifteen-foot setback restrictive covenant that had been incorporated as part of the defendants' warranty deed for the lot. The defendants, who had built a two-story home, had argued that they should not be required to remove the second story because they did not have *"actual* knowledge of the one-story restriction until after [the plaintiffs] brought it to their attention [which was] after the second story [of the home] was completed[,]"

*id.* at 52, at ——, —— P.2d at ——, and consequently, could not have intentionally and deliberately violated the restrictions nor intentionally assumed the risk of such a violation. *Id.* (emphasis in original).

In deciding *Fong,* we noted that "[w]hile the defendants in *Sandstrom* were found to have had both actual *and* constructive notice of the height restriction they violated, the supreme court indicated that actual *or* constructive notice would support the granting of a mandatory injunction." *Id.* (emphases in original) (citation omitted). Based on our review of the record, we concluded that the *Fong* defendants had "constructive notice" of the covenant because: (1) their deed "provided that the conveyance was subject to the restrictions and covenants contained in the [previous owners'] deed ... [and] review of that deed would have revealed the height and setback restrictions[,]" *id.* at 53, at ——, —— P.2d at ——, and (2) " '[w]here a covenant is contained in a prior instrument within the successor's direct chain of title conveying that land in fee simple, the successor is charged with constructive notice of the covenant.' " *Id.* (citation omitted). Responding to the defendants' argument that they should be relieved of fault because they had been informed by their building contractor, who had examined all the relevant restrictions on construction of their home, that the construction of a two-story home would comply with all legal requirements, *id.* at 54, at ——, —— P.2d at ——, we stated that the defendants' " 'mistaken assumption that they were acting legally and properly did not confer immunity upon them from the right of the plaintiffs ... to seek equitable enforcement of the restriction.' " *Id.* (brackets omitted, quoting *Sandstrom,* 59 Haw. at 500, 583 P.2d at 978).

■ Under *Sandstrom* and *Fong,* therefore, mandatory injunctive relief must be granted to eradicate a violation of a restrictive covenant if two elements are present: (1) the defendant had actual or constructive knowledge of the restrictive covenant; and (2) despite such knowledge, the defendant deliberately and intentionally proceeded with construction violative of the covenant or intentionally assumed the risk of violating the covenant without first obtaining a resolution

of the covenant. We examine, therefore, whether the record reveals the presence of those two elements in this case.

### 1.

■ The record overwhelmingly indicates that the WRE Defendants had actual *and* constructive notice of the restrictive covenant governing Lot 29 but nevertheless deliberately and intentionally proceeded to construct the roadway and tennis court on the lot or intentionally assumed the risk of violating the covenant, "without first obtaining a resolution of the restrictive covenant."

According to the record, when the WRE Defendants acquired Lot 29 by warranty deed on August 26, 1986, the deed expressly specified that the property was being conveyed subject to the MM III "[r]estrictive covenants and conditions contained in Declaration dated November 5, 1971, recorded in said Bureau of Conveyances in Liber 8043 on Page 464." Since these covenants were in the WRE Defendants' "direct chain of title," the WRE Defendants clearly had "constructive notice of the covenant." *Fong* at 53, at ——, —— P.2d at ——.

Additionally, the evidence establishes that the WRE Defendants had actual knowledge of the covenant's existence. Their marketing brochure for the WRE Subdivision, for example, contained the following statement acknowledging the existence of the MM III restrictive covenants: "Maui Meadows lacks effective restrictive covenants which has resulted in a somewhat uneven quality of homes[.]" Moreover, the testimony of various WRE partners confirmed that the WRE Defendants were well-aware of the MM III restrictive covenants. For example, Kean, an experienced real estate developer and general contractor, admitted that he had previously owned a houselot in MM III which was subject to the same restrictive covenants that regulated Lot 29. Rink, a lawyer who practiced primarily in the area of real estate, stated that he had reviewed the MM III covenants during the creation of the WRE Subdivision. Bello, a real estate broker, testified that he was quite familiar with the MM III restrictive covenants, since he had owned a houselot in MM III for about ten years and

had "transacted and been part of several sales up there[.]" Farrington, an architect and contractor, testified that over the past fifteen years, he had been dealing a lot with "covenants, guidelines, restrictions[.]"

■ There is also substantial evidence that the WRE Defendants, despite their constructive and actual knowledge of the restrictive covenants governing Lot 29, intentionally and deliberately developed and moved ahead with plans to construct a roadway and tennis court on the lot, in direct violation of the covenant. Moreover, even when Pelosi noticed construction activity on Lot 29, began asking questions about what was transpiring, and expressed concerns that the construction appeared to violate the covenant, the WRE Defendants were not candid with Pelosi about their plans for the lot [2] and continued their construction activity, without seeking a declaratory judgment or other resolution of the covenant issue.

Furthermore, even when Pelosi's legal counsel sent a certified letter dated May 18, 1988 to Rink, as attorney for the WRE Defendants, formally requesting that the roadway surface be removed from Lot 29 and that no tennis court be erected on Lot 29 because such construction would be violative of the MM III Covenants, the WRE Defendants did not seek a resolution of the covenant issue. Instead, Rink responded with a letter dated May 26, 1988, in which he stated, in part:

> Mr. Pelosi has been successful in harassing our workers and delaying completion of the project, however, the partnership will not concede that he is in the right. There is no law or regulation that prevents the use as intended. A tennis court is a permitted use as ancillary to park and recreational facilities and is permitted on residential land. There is no prohibition on placing private driveways on residential land. *The partnership will not accede to your demands and intends to completed [sic] the tennis court.*

(Emphasis added.)

In our view, the foregoing evidence clearly establishes the presence of the two elements that would entitle Pelosi to a mandatory injunction against the WRE Defendants. Therefore, if the WRE Defendants were still the owners of Lot 29, we would not hesitate to conclude, in accordance with *Sandstrom* and *Fong*, that Pelosi is entitled to a mandatory injunction, ordering the WRE Defendants to remove the roadway and tennis court.

2. For example, during a meeting with Defendant–Appellee Hugh Jeffrey Farrington, Stephen K. Rink (Rink), and John Kean in either July or late 1987, Plaintiff/Counterclaim Defendant–Appellant Angelo Pelosi (Pelosi) specifically asked them whether a roadway and tennis court for the WRE Subdivision were being built. Pelosi was told that a "private driveway" was being built and a tennis court was being "considered." Yet, a March 12, 1986 letter from WRE partner Stephen Pitt (Pitt) to Alvin K. Fukunaga, Director of Public Works for the County of Maui (County), clearly reveals that the roadway and tennis court were part of the WRE Defendants' initial plans for Lot 29. In that letter, Pitt states:

> The County's preliminary subdivision approval dated January 20th, 1986, Section 1.C requested that a fire hydrant be installed to serve Lot [29]. It is requested that this requirement be dropped due to the fact that *Lot [29] is a roadway lot.* The remnant of the land remaining after roadway construction is smaller than County requirements for residential construction. *The intent in this instance is to construct a tennis court on this portion of land.*

(Emphases added.)

There is other documentary evidence in the record that also reflects the WRE Defendants' express intention to build a tennis court on Lot 29. In a letter to Kenneth Kong (Kong) of the Land Use and Codes Administration Office of the County dated April 8, 1988, WRE partner Rink expressed dismay at having just learned of a telephone conversation between Kong and WRE partner Satish Gholkar (Gholkar) in which Kong advised Gholkar that a tennis court was not allowed on Lot 29. Rink informed Kong that it was the understanding of the WRE Defendants *that they had gotten preliminary approval from the County for the construction of the tennis court.* Rink further stated:

> Had [WRE] ever been put on notice that there would be problems in proceeding as planned, an adjustment in this development would have been made to conform with any reasonable requirements that may have been imposed.
>
> At this late date, the course of action has already been planned and committed to, with the sanction of your department. [WRE partners] have no alternative but to meet their obligations to Purchasers of lots and intend to conclude the project as originally planned.

Id.

**2.**

It appears to be undisputed, however, that the interest of the WRE Defendants in Lot 29 has been transferred to the Individual Defendants or other owners of lots in the WRE Subdivision, as tenants in common. Although the Individual Defendants presumably had at least constructive notice of the restrictive covenant at issue,[3] there is no evidence that they participated in any way in the construction of the roadway or tennis court that were in violation of the restrictive covenant. As to the Individual Defendants, therefore, the record does not indicate the presence of the two elements necessary for Pelosi to be entitled to a mandatory injunction eradicating the covenant violations.

The thorny dilemma that confronts us, then, is whether the Individual Defendants, who succeeded to the interest of the WRE Defendants in Lot 29 and had no part in breaching the restrictive covenant, can be required to bear the brunt of any mandatory injunction that Pelosi is entitled to enforce against the WRE Defendants.

**3.**

In *Sandstrom*, the appellees sued to enforce a restrictive covenant and sought a mandatory injunction, requiring the appellants to remove the top story of the appellants' residential structure. By the time the appeal was decided, the appellees had apparently sold their residence. The Hawai'i Supreme Court noted that if the appellees had in fact sold their property

> there may be a valid question as to whether appellees continue to be the proper parties for purposes of the enforcement of the mandatory injunction. There is some indication that a party, after selling all

interest in its relevant property, can no longer proceed with enforcement of *injunctive* relief granted in its favor in connection with rights attaching to that property.

*Sandstrom*, 59 Haw. at 502, 583 P.2d at 979 (emphasis in original).

In this case, it is the party *against* whom injunctive relief should be granted which has transferred its interest in the property. The question confronting us, therefore, is whether Pelosi lost his entitlement to mandatory injunctive relief as against the WRE Defendants because the WRE Defendants transferred their interest in Lot 29 to the Individual Defendants.

From a public policy standpoint, we believe that where a property owner deliberately or intentionally violates, or intentionally assumes the risk of violating, a restrictive covenant running with the property and thereafter transfers the property to an "innocent purchaser," it would be inequitable to preclude a person seeking to enforce the covenant from entitlement to mandatory injunctive relief merely because the violator of the covenant no longer holds an interest in the property. At the same time, we recognize that it may be unfair in certain situations to require an "innocent purchaser" of property on which a prior landowner has deliberately and intentionally violated or intentionally assumed the risk of violating a restrictive covenant to bear the brunt of a mandatory injunction to remove the covenant violation.

In *Sandstrom*, the appellants conceded that their two-story home was constructed in violation of a covenant restricting the height of any structure to "one-and-one-half stories." However, they raised the affirmative defenses of abandonment[4] and changed con-

---

**3.** There is no direct evidence in the record as to whether the individual Defendants/Counterclaimants–Appellees (Individual Defendants) had actual or constructive notice of the restrictive covenant at issue in this case. However, we presume that the deeds of the Individual Defendants to their respective lots in the WRE Subdivision incorporated the Maui Meadows III (MM III) Covenants so that under the principles articulated in *Sandstrom v. Larsen*, 59 Haw. 491, 583 P.2d 971 (1978), and *Fong v. Hashimoto*, No. 19424, slip op. at 50, —— Hawai'i ——, ——, —— P.2d at ——, —— (App. February 20, 1998), *cert. grant-*

ed, —— Hawai'i ——, —— P.2d —— (April 2, 1998), the Individual Defendants had at least constructive notice of the requirements of the covenant.

**4.** The appellants in *Sandstrom* contended that the restrictive height covenant had been abandoned and could no longer be enforced against them. 59 Haw. at 496, 583 P.2d at 976. In support of their contention, the appellants pointed to the presence of other structures in their subdivision which were two to three stories in height and claimed that the presence of these structures

ditions[5] in arguing that the covenant could not be enforced against them. Alternatively, they argued that the trial court should not have issued a mandatory injunction requiring them to remove the top story of their home, without considering the relative hardship to the parties. Rejecting the appellants' arguments, the Hawai'i Supreme Court initially disagreed with the appellants that the covenant was no longer enforceable because it had either been abandoned or its purpose had been destroyed due to changed circumstances. The supreme court stated that "to support a finding of abandonment, it must be shown that the lot owners of the subdivision acquiesced in substantial and general violations of the covenant within the restricted area[,]" *id.* at 497, 583 P.2d at 976, a showing that had not been made. The supreme court also held that

> in order to warrant a refusal to enforce a restriction, any change in conditions must be so great or radical as to neutralize the benefits of the restriction and destroy its purpose. Moreover, if the benefits of the original restriction can still be realized for the protection of the subdivision properties, no sufficient change of conditions will be recognized so as to defeat the restriction.

*Id.* at 498, 583 P.2d at 977 (quotation marks and citations omitted). The supreme court observed that the construction of a high-rise condominium nearby did not diminish the value of the restrictive height covenant but actually enhanced its protective value by making the remaining view of the subdivision residents "all the more valuable and worthy of preservation." *Id.* Therefore, the restrictive covenant remained enforceable.

Having determined that the covenant was enforceable, the supreme court then analyzed whether the trial court had erred by issuing a mandatory injunction to require removal of that part of their home which violated the restrictive height covenant, "without first considering the relative hardship between the parties." *Id.* In concluding that no error had been committed, the supreme court emphasized that mandatory injunctive relief to eradicate the covenant violation is the proper remedy "where a property owner deliberately and intentionally violates a valid express restriction running with the land *or intentionally takes a chance*" of violating the covenant. *Id.* at 500, 583 P.2d at 978 (emphasis in original, internal quotation marks omitted). The supreme court explained that "the relative hardships to the parties has [sic] no application to the award of final relief" in such instances because "the court is enforcing an established legal right embodied in the covenants[.]" *Id.* at 499, 583 P.2d at 978.

Clearly, under *Sandstrom*, the relative hardship to the WRE Defendants was irrelevant to any determination of whether a mandatory injunction should issue against them, since, with actual and constructive knowledge of the covenant, they acted at their own peril in proceeding with the construction of the roadway and tennis court " 'without first obtaining a resolution of the covenant.' " *See Sandstrom*, 59 Haw. at 499, 583 P.2d at 978. The Individual Defendants maintain, however, that the relative hardships they would suffer should be weighed in considering whether a mandatory injunction should issue against them. We agree.

In *Horvath v. Gladstone*, 97 Nev. 594, 637 P.2d 531 (1981), the Nevada Supreme Court held, on similar facts, that the equitable principle of relative hardship is available to "a purchaser who has performed *no act in violation* of the restrictions and who merely purchased a house which contained an existing violation of the restrictions[.]" *Id.* at 533. The supreme court thus distinguished the "innocent purchaser" situation from that of an owner with both actual and constructive notice of a covenant who nevertheless violates the covenant. *Id.*

We examine, therefore, whether the circuit court properly determined, after weighing

---

evidenced acquiescence in and a mutual disregard of violations of the covenant. *Id.*

5. The *Sandstrom* appellants contended that because of changed conditions, specifically, the construction of a thirteen-story condominium building in close proximity to their subdivision, the height restrictive covenant could no longer be enforced against them. 59 Haw. at 498, 583 P.2d at 977.

the relative hardships, that injunctive relief should not issue in this case.

### 4.

In this case, the circuit court's determination that, upon "balancing the equities," injunctive relief for removal of the roadway and/or tennis court "would not serve justice," appears to be premised on the following findings of fact:

11) [Pelosi] ... was living adjacent to the defendants [sic] development with a clear observation as to the progress of the construction. He had the opportunity to determine from the instigation of the defendants [sic] plans in 1986 whether to involve himself but expressed no objections until the spring of 1988. Even if [Pelosi's] version were accepted, construction on Lot 29 was substantially completed by July 1987 way before [Pelosi] alleges he met with [the WRE Defendants] in late 1987 and warned [the WRE Defendants].

12) Since 1986, development has not been enjoined or delayed and additional party defendants have been added who have purchased lots and/or built upon them. The Wailea Ranch Estates may no longer exist as the original entity it once was.

13) Subjecting the defendants as well as subsequent innocent purchases [sic] to the injunctive relief sought by [Pelosi] would create substantial hardship on their part by effectively terminating access to the subdivision and thereby creating an illegal subdivision.

■ Our review of the record indicates that there was substantial evidence adduced below to support the circuit court's findings that the *roadway* was substantially completed by July 1987 and that Pelosi did not express concerns about the roadway until late 1987 at the earliest. Pelosi, in his opening brief, admits that "[i]n mid–1987 construction work on Lot 29 progressed to the point where it became apparent to [Pelosi] that it was going to be used for a roadway access to [the WRE] subdivision." Pelosi also testified that in October or November 1987, he asked for and received from WRE partner Bello a packet of materials about the

WRE Subdivision, which included: a map of the subdivision, a price list of the nine lots for sale that indicated that Lots 1, 2, 3, 4, 5, 8, and 9 were already sold, and an offering circular describing the subdivision.

Since Pelosi waited until May 1988 to formally request that the WRE Defendants remove the roadway and until August 1988 to file the instant action, we cannot conclude that the circuit court erred when it considered Pelosi's delay, balanced the equities, determined that closing up the roadway would deprive the Individual Defendants of access to the WRE Subdivision and create too much of a hardship on them, and consequently, declined to award Pelosi mandatory injunctive relief.

■ Our review of the record on appeal reveals no evidence, however, to support a finding that construction of the *tennis court* was substantially completed by July 1987. The evidence reveals instead that when it became apparent that a roadway to a new subdivision was being constructed on Lot 29 sometime in 1987, Pelosi asked for and received a packet of materials about the WRE Subdivision. The materials indicated that a tennis court was to be built for residents of the Subdivision but did not indicate where on the lot the tennis court was to be constructed. When Pelosi began to ask the WRE Defendants questions about what was transpiring on Lot 29, he was not given direct answers. Consequently, Pelosi began his own investigation to determine what was happening on Lot 29. During a meeting with several WRE Defendants in October or November 1987, Pelosi specifically asked them whether a tennis court would be built on Lot 29. Although the initial plans for the WRE Subdivision submitted to the County of Maui (County), as drawn up in 1986, called for a tennis court to be constructed on Lot 29, the WRE Defendants did not answer Pelosi's question affirmatively; instead, they told him they were "considering" the placement of a tennis court on Lot 29. Unsatisfied with this response, Pelosi, in November 1987, wrote to several government agencies, in an effort to locate the WRE Subdivision plans submitted to the County, learn whether Lot 29 was to

be used for a tennis court, and determine who approved the construction of a roadway and tennis court on the lot. On April 8, 1988, the County, in response to Pelosi's inquiry, wrote a letter to Pitt, stating in part as follows:

> It is our understanding that *you plan to construct* a tennis court on a parf of Lot [29] ... of the [WRE] subdivision. Said lot is designated as a private roadway, and as such, its use is restricted to access and utility purposes. Hence, construction of a tennis court is not allowed.

(Emphasis added.) The clear implication of the County's letter is that as of April 8, 1988, the tennis court had not yet been constructed. In addition, a letter from Rink to the County, dated April 8, 1988, indicated that the tennis court had not yet been constructed on Lot 29. In the letter, Rink stated that because no objection had earlier been made by the County to the WRE Subdivision plans, the lots in the WRE Subdivision had been sold with a commitment that the tennis court would be built. Finally, in May 1988, after the County had determined that a roadway and tennis court on Lot 29 would not violate any county or state laws, and after Pelosi was unable to convince the WRE Defendants that a roadway and tennis court on Lot 29 would nevertheless violate the MM III covenant, Pelosi retained an attorney, who sent Rink a certified letter on May 18, 1988, demanding that the roadway be removed from Lot 29 and cautioning him that erecting a tennis court would aggravate the violation of the covenant. In a May 26, 1988 letter responding to the request from Pelosi's attorney, Rink stated: "The partnership ... intends to completed [sic] the tennis court." True to Rink's words, the WRE Defendants did actually proceed to construct the tennis court, and Pelosi filed the underlying suit on August 26, 1988, seeking, among other remedies, mandatory injunctive relief to remove the roadway and tennis court.

In light of the foregoing evidence, FOF No. 11, insofar as it can be construed as a finding by the circuit court that the tennis court was completed in July 1987, is clearly erroneous. Moreover, in view of the clear evidence in the record that (1) the WRE Defendants were not candid with Pelosi when he asked them if they intended to build a tennis court on Lot 29, (2) Pelosi actively sought to determine whether a tennis court was planned for Lot 29, (3) Pelosi voiced his strong objection to the construction of a tennis court on Lot 29, both to the WRE Defendants and the County, (4) Pelosi retained an attorney to file suit against the WRE Defendants, and (5) Pelosi warned the WRE Defendants that a tennis court would be in violation of the restrictive covenant governing MM III lots, we cannot conclude that Pelosi's failure to file the underlying lawsuit until August 1998 constituted laches that would deprive Pelosi of any entitlement to mandatory injunctive relief as to the tennis court.

B. *Whether Pelosi Should Have Been Allowed to Adduce Testimony on the Availability of an Alternative Access to the WRE Subdivision*

■ Pelosi claims that the circuit court abused its discretion when it refused to allow him to adduce testimony on whether an alternative access to the WRE Subdivision was available. We disagree.

The record reveals that on remand, Pelosi moved for entry of mandatory injunction "based on the trial transcript and the exhibits admitted in evidence at the trial." It was only after the circuit court balanced the equities and denied Pelosi the injunctive relief he requested that Pelosi filed a motion to allow him to adduce additional testimony on the access issue. In light of Pelosi's earlier request that the circuit court decide the appropriateness of the mandatory injunction remedy based on the evidence admitted at trial, we cannot conclude that the circuit court abused its discretion when it refused to allow Pelosi a second chance to prove his entitlement to a mandatory injunction.

C. *The FsOF*

Pelosi contends that FsOF No. 3, 4, 5, 7, 8, 9, and 10 were contrived, irrelevant, and clearly erroneous. We conclude that while these findings were not clearly erroneous, they were irrelevant to the issue of whether

Defendants had violated the restrictive covenant at issue in this case.

■ For example, FsOF No. 3, 4, 5, 7, and 8 support Defendants' contention that the use of Lot 29 for a roadway and tennis court for the adjoining WRE Subdivision did not violate any state or county laws, the County of Maui had no objection to the use of Lot 29 for a roadway and tennis court, and the County of Maui would not have approved the WRE Subdivision if Lot 29 had not been available as an access to the subdivision. The fact that the roadway and tennis court were permissible uses of Lot 29 under state and county law, however, does not relieve the WRE Defendants from a covenant that is more restrictive than the law:

> Restrictive covenants do not supersede or in any way affect the requirements of an already existing zoning ordinance. If the restrictive covenant is less restrictive than the ordinance, the ordinance prevails, and if the restrictive covenant is more restrictive than the ordinance, the covenant prevails as to purchasers; ... Conversely, a zoning ordinance cannot destroy, impair, abrogate, or enlarge the force and effect of an existing restrictive covenant; that is, a valid restriction upon the use of property is not terminated, superseded, or nullified by the enactment of a zoning ordinance, nor is the validity of the restriction thereby affected. Zoning ordinances if less stringent do not diminish the legal effect of private building restrictions, and the rezoning of property for purposes other than residential does not supersede the original plat restrictions so as to prevent the enforcement of such restrictions.

20 Am.Jur.2d *Covenants, Etc.* § 242, at 658–59.

In view of our legal conclusion in *Pelosi I* that the MM III restrictive covenant prohibited use of Lot 29 for a roadway and tennis court for the WRE Subdivision, 10 Haw.App.

at 441, 876 P.2d at 1329, it is irrelevant that Defendants' expertise gave credence to their conclusions that a roadway and tennis court were permitted on Lot 29, FOF No. 9, and that the jury's determination that Lot 29 was being used for residential purposes confirms the correctness of Defendants' expert opinions, FOF No. 10.

### D. *The CsOL*

Pelosi's final argument on appeal is that the circuit court erred in entering CsOL No. 1, 2, and 3, all of which concluded that injunctive relief was not appropriate in this case. In light of our foregoing discussion, we agree that the CsOL were erroneous insofar as the tennis court was concerned.

### CONCLUSION

Accordingly, we affirm the circuit court's denial of mandatory injunctive relief to Pelosi, requiring removal of the roadway on Lot 29. However, we conclude that Pelosi was entitled to a mandatory injunction, ordering Defendants to remove the tennis court from Lot 29. Therefore, we vacate that part of the circuit court's judgments and orders which denied Pelosi a mandatory injunction as to the tennis court and remand this case to the circuit court for entry of a mandatory injunction order requiring the removal of the tennis court on Lot 29.

Opinion by ACOBA, J., concurring in part and dissenting in part.

I concur in the majority's conclusion that "[Plaintiff/Counterclaim Defendant–Appellant Angelo] Pelosi [ (Pelosi) ] was entitled to a mandatory injunction, ordering [Defendant–Appellee Wailea Ranch Estates (WRE), a general partnership (the partnership and its partners are hereinafter collectively referred to as the WRE Defendants), the Individual Defendants/Counterclaimants–Appellees,[1] and Defendant–Appellee Tina Sohn

---

1. The phrase "Individual Defendants" as used herein refers to the named Individual Defendants/Counterclaimants–Appellees at the time this court issued its opinion in *Pelosi v. Wailea Ranch Estates*, 10 Haw.App. 424, 876 P.2d 1320, *reconsideration denied*, 10 Haw.App. 631, 879 P.2d 591, *cert. denied*, 77 Hawai'i 373, 884 P.2d

1149 (1994) (*Pelosi I*), who were identified as the owners of individual lots in the Wailea Ranch Estates (WRE) Subdivision, and who shared an undivided interest in Lot 29 of the Maui Meadows III (MM III) Subdivision. Defendant–Appellee Tina Sohn (Sohn) was not joined as a defendant until after the remand required under *Pelosi*

(Sohn) ] to remove the tennis court from Lot 29 [of the Maui Meadows III (MM III) Subdivision]," majority opinion at 534, 985 P.2d at 1101, but not in its reasoning in arriving at that conclusion.

Further, I do not agree with the majority's holding that "due to Pelosi's laches in bringing the action to enforce the covenant as to the roadway, Pelosi is not entitled to a mandatory injunction to remove the roadway[,]" and the majority's conclusion that "the [second circuit court (the court) ] did not abuse its discretion when it balanced the equities and declined to order removal of the roadway." Majority opinion at 524, 985 P.2d at 1091. Rather, I would instruct the court to order the WRE Defendants, the Individual Defendants, and Sohn to remove the roadway as well as the tennis court from Lot 29 because both structures violated the November 5, 1971 MM III "Declaration of Restrictive Covenants" which limits the uses to which Lot 29 may be subjected (the MM III Covenants).

## I.

In *Pelosi v. Wailea Ranch Estates,* 10 Haw.App. 424, 876 P.2d 1320, *reconsideration denied,* 10 Haw.App. 631, 879 P.2d 591, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994) (*Pelosi I* ), this court remanded the case to the court with instructions to determine whether "*Defendants* [ (the *Pelosi I* court referring to both the WRE Defendants and the Individual Defendants) ] deliberately and intentionally violated the MM III Covenants or intentionally assumed the risk of such violation[.]" *Id.* at 446, 876 P.2d at 1331 (emphasis added). If such violation was found, this court ordered that "a mandatory injunction should issue forthwith, ordering Defendants to remove *the roadway and tennis court* on Lot 29." *Id.* (emphasis added).

Nowhere in its instructions to the court did this court distinguish between the potential culpability of the WRE Defendants and the

*I* and is referred to separately from the Individual Defendants.

**2.** Warranty deeds for WRE Subdivision lots 1, 2, 3, 4, 6, 7, and 9 are attached to the deposition of Jeannie Wenger, the Custodian of Records for Standard Title & Escrow (Standard), which is

Individual Defendants or other subsequent purchasers as the majority does now. Further, on appeal in *Pelosi I,* and on remand to the court, none of the parties argued that the WRE Defendants' liability and that of the Individual Defendants or Sohn was, or should be treated as, distinct from one another. The majority's decision to make Pelosi's remedy for violation of the MM III Covenants contingent upon ownership of Lot 29 at the time of trial or at the time of appeal is insupportable. The record clearly demonstrates that the MM III Covenants applied not only to the WRE Defendants, but to the Individual Defendants and Sohn as well.

## II.

The Individual Defendants received notice of the restrictive covenant through the chain of title for each lot. The record contains warranty deeds for several of the lots in the WRE Subdivision.[2] Each warranty deed in the record states that, together with the conveyance of the particular lot, each owner received "an undivided one-ninth (1/9th) interest ... of Lots 10, 11, and 12 of [the WRE Subdivision]."

Lot 10 of the WRE Subdivision included Lot 29. *Pelosi I,* 10 Haw.App. at 430–31, 876 P.2d at 1324–25. The conveyance of Lots 10, 11 and 12 was specifically subject to, *inter alia,* the MM III Covenants, described in the deeds as "Restrictive Covenants and Conditions dated November 5, 1971, recorded in Liber 8403 at Page 464, affecting portions of Lot 10 of the [WRE] Subdivision."

In their answers to Pelosi's complaint, all of the WRE Defendants and the Individual Defendants admitted that Lot 29 was subject to the MM III Covenants. Sohn has never filed an answer in this case but does not contend otherwise.

Thus, the record plainly and amply demonstrates that notice of the MM III Covenants was in the chain of title for the lots in the

included in the record on appeal. All of those warranty deeds state that the conveyance was subject to the November 5, 1971 MM III "Declaration of Restrictive Covenants" (the MM III Covenants).

WRE Subdivision. Indeed, the majority agrees that "the deeds of the Individual Defendants [including Sohn] to their respective lots in the WRE Subdivision incorporated the [MM III] Covenants so that ... the Individual Defendants [and Sohn] had *at least* constructive notice of the requirements of the covenant." Majority opinion at 530, 985 P.2d at 1097 n. 3 (emphasis added).

## III.

The first paragraph of the MM III Covenants contained the restrictive covenant at issue:

*No lot shall be used except for residential purposes.* No building shall be erected, placed or permitted to remain on any lot *other than a single family dwelling* not to exceed one and one-half stories in height and any accessory buildings.

*Pelosi I,* 10 Haw.App. at 428, 876 P.2d at 1323 (emphases added).

Considering the purpose of the MM III Covenants and the facts, this court concluded in *Pelosi I* that the subject covenant was "clearly breached" by Defendants:

In our view, the clear and unambiguous terms of the MM III Covenants, construed in accordance with their plain, ordinary, and accepted meanings, lead to but one conclusion: only one single-family dwelling and such buildings as are strictly accessory to the use of that dwelling may be constructed on an MM III houselot. Since Lot 29 contains no single-family dwelling, and the roadway and tennis court[3] on Lot 29 are accessory to residences in a completely different subdivision, *the restrictive covenant was clearly breached.*

*Id.* at 437, 876 P.2d at 1327 (emphasis added). The majority, however, leaves Pelosi without a remedy for the wrongful construction of a roadway on Lot 29.

**3.** In *Pelosi I* this court did not make any specific conclusions regarding whether or not a tennis court constituted a "residential purpose" under the MM III Covenants. Instead, this court apparently concluded that the MM III Covenants

## IV.

The WRE Defendants apparently no longer hold an interest in Lot 29. After having decided that the WRE Defendants intentionally violated the MM III Covenants, the majority observes:

[I]t would be inequitable to preclude a person seeking to enforce the covenant from entitlement to mandatory injunctive relief merely because the violator of the covenant no longer holds an interest in the property. *At the same time, we recognize that it may be unfair in certain situations to require an "innocent purchaser" of property on which a prior landowner has deliberately and intentionally violated or intentionally assumed the risk of violating a restrictive covenant to bear the brunt of a mandatory injunction to remove the covenant violation.*

Majority opinion at 530–531, 985 P.2d at 1097–1098.

The import of this proposition is that a restrictive covenant runs only against the first purchaser, even if subsequent purchasers have notice of the covenant through their chain of title. Such a result is unacceptable if restrictive covenants are to have any meaning or effect. Contrary to the court's and the majority's view, the Individual Defendants and Sohn were not "innocent," for subsequent purchasers with notice are bound to restrictive covenants:

*An equitable restriction only binds a subsequent purchaser for value where the purchaser has acquired an interest with "notice" of the original promise. The requisite notice can be actual notice or "constructive" notice established by recordation of a prior instrument containing the restriction.* ... Whether later deeds incorporate the restrictions or not, subsequent grantees take with notice of the recorded declaration of restrictions....

9 R. Powell & P. Rohan, *Powell on Real Property* § 60.01[2] at 60–10—60–11 (1998) [hereinafter *Powell* ] (emphasis added) (foot-

were breached because the tennis court on Lot 29 was "accessory to residences in a completely different subdivision." 10 Haw.App. at 437, 876 P.2d at 1327.

notes omitted). Accordingly, the mere transfer of interest in the land from the WRE Defendants to the Individual Defendants and Sohn did not nullify the covenant. The Individual Defendants and Sohn had notice of the MM III Covenants through the chain of title to their respective lots. Thus, they were and are bound by the MM III Covenants.

In this suit, neither the Individual Defendants nor Sohn sought to sue over as against the WRE Defendants for any damages which they might suffer as a result of the covenant's breach. Thus, even the Individual Defendants and Sohn recognize that their rights and obligations were inextricably tied to the WRE Defendants[4] since the subject covenant burdened the land, and is as binding on the WRE Defendants' successors-in-interest to Lot 29 as it was on the WRE Defendants themselves.

## V.

Unlike the majority, I believe the "relative hardship" doctrine does not apply to this case. In *Sandstrom v. Larsen,* 59 Haw. 491, 499, 583 P.2d 971, 978 (1978), the Hawai'i Supreme Court ruled that

> [a] basic consideration in the enforcement of restrictive covenants "is that they are enforceable through the equitable relief afforded by an injunction." *McDonough v. W.W. Snow [Constr.] Co.,* 131 Vt. [436,] 441, 306 A.2d [119,] 122 [ (1973) ]. As such, *because the court is enforcing an established legal right embodied in the covenants,* "the relative hardships to the parties has no application to the award of final relief to the plaintiff." *Id.*

(Emphasis added). Thus, where a restrictive covenant is violated, the relative effects of enforcing it are not relevant.

In *McDonough,* cited by the Hawai'i Supreme Court, the Vermont Supreme Court observed that " '[w]hether there will be greater hardship on the defendants than benefit to

*the plaintiff has no application* here to the award of final relief to the plaintiff for the protection of established legal rights.' " 306 A.2d at 124 (emphasis added) (quoting *Welch v. Barrows,* 125 Vt. 500, 218 A.2d 698, 705 (1966) (holding that, where a defendant with notice of a restrictive covenant barring construction on a certain parcel of land had, nevertheless, erected one-and-one-half cabins on the restricted land, the proper remedy was to order removal of the cabins)). Thus, a restrictive covenant embodying "an establish[ed] legal right[ ]" may not be undermined by any supposed relative hardship brought about by its enforcement. *McDonough,* 306 A.2d at 124.

In *Peters v. Davis,* 426 Pa. 231, 231 A.2d 748, 752 (1967), another case relied on by the supreme court in *Sandstrom,* the Pennsylvania Supreme Court held that "[i]f a property owner, deliberately and intentionally violates a valid express restriction running with the land or intentionally takes a chance, the appropriate remedy is a mandatory injunction to eradicate the violation." (Internal quotation marks omitted.)

Plainly, then, the application of the relative hardship doctrine is rejected where a defendant deliberately violated or *intentionally takes a chance of violating a restrictive covenant. Sandstrom,* 59 Haw. at 501, 583 P.2d at 979. Where, as here, subsequent purchasers, like the Individual Defendants and Sohn, had notice of the restrictive covenant and yet chose to proceed with the purchase of the offending property, I believe they have "intentionally take[n] a chance" and thus "a mandatory injunction [should issue] to eradicate the violation." *Id.* at 500, 583 P.2d at 978 (citation and internal quotation marks omitted).

Under the majority's approach, parties, like the WRE Defendants, can breach a restrictive covenant but preclude its enforcement and escape liability by simply selling the property. It appears, then, that the

---

**4.** During the initial proceedings in the second circuit court (the court), the appeal that led to *Pelosi I,* and the subsequent remand, Defendant-Appellee Wailea Ranch Estates, a general partnership, and its partners (collectively the WRE Defendants) and the Individual Defendants were represented by the same counsel. During this current appeal, the WRE Defendants and the Individual Defendants are all represented by the same counsel. The Individual Defendants did not file any appellate briefs separate from those of the WRE Defendants. Neither the Individual Defendants nor Sohn filed cross-claims or third-party complaints against the WRE Defendants.

WRE Defendants could have escaped liability for breaching the restrictive covenant at any time during the course of the proceedings, either during trial, on remand, or on appeal, by simply transferring their interest in Lot 29.

Further, subsequent purchasers who have notice of the covenant, yet proceed to purchase the property, are excused as "innocent" because they purchased after the initial breach. Under the majority's reasoning, it is difficult to determine exactly when a party, such as Pelosi, could ever enforce a restrictive covenant against a subsequent purchaser. The fact is the restrictive covenant continues to be and is currently being breached.

In sum, the relative hardship doctrine circumvents the plain purpose of a restrictive covenant. "The entire validity of the doctrine of relative hardship has been challenged on the ground that it cannot fairly be called a 'hardship' to enforce against a defendant a *restriction of which he [or she] had knowledge or notice when he [or she] acquired his [or her] land.*" *Powell, supra,* § 60.10[1] at 60–152 (footnote omitted) (emphasis added) (citing *Sandstrom,* 59 Haw. at 491, 583 P.2d at 971). Given the notice to the Individual Defendants and Sohn and the clear breach of the MM III Covenants, the relative hardship doctrine is simply not applicable in this case. Any supposed hardship to the Individual Defendants and Sohn was one of their own making.[5]

## VI.

Further, I cannot concur in the majority's belief that Pelosi's right to enforce a restrictive covenant cannot extend to subsequent "innocent" purchasers. In *Sandstrom,* the supreme court addressed the ability of a successor-in-interest in land to enforce a restrictive covenant. The supreme court noted that under Hawai'i Rules of Civil Procedure (HRCP) Rule 25(c), a "successor-in-interest [to the benefit of a restrictive covenant] may be substituted as a named party and may continue to seek enforcement of the . . . injunction." *Sandstrom,* 59 Haw. at 502, 583 P.2d at 979. It follows that this rule, if applicable, allows a party, like Pelosi, to enforce a restrictive covenant against any successor-in-interest of the WRE Defendants who takes subject to the restrictive covenant.

HRCP Rule 25(c), entitled "Transfer of Interest," provides that "[i]n case of any transfer of interest, the action may be continued *by or against the original party,* unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." (Emphasis added.) In this case, Pelosi filed suit against the WRE Defendants and Doe Defendants. *Pelosi I,* 10 Haw.App. at 432, 876 P.2d at 1325. He subsequently identified some of the Doe Defendants as the Individual Defendants. *Id.* Later, on remand, Pelosi joined Sohn. Majority opinion at 524, 985 P.2d at 1091 n. 1. Plainly, then, under HRCP Rule 25(c), Pelosi can maintain

---

5.  The majority relies, in part, on *Horvath v. Gladstone,* 97 Nev. 594, 637 P.2d 531 (1981) (per curiam).

   I do not find *Horvath* persuasive. That case involved an appeal from a summary judgment granted the Gladstones, who had obtained an order requiring the Horvaths to remove the second story of the Horvaths' home. *Id.* at 533. Summary judgment was granted on the basis of *res judicata* because the Gladstones had obtained a court order in a prior lawsuit directing the Gregorys, the previous owners of the home, to remove the second story. *Id.* at 532.

   On remanding, the Nevada Supreme Court said that the relevant question was whether the Horvaths "had actual or constructive notice of [prior] litigation so as to preclude the balancing of equities . . . [,]" *id.* at 533 n. 3, even though the Horvaths admittedly "had constructive notice of the [restrictive covenant]." *Id.* at 533. It is important to note that the Horvaths had purchased the home while the Gladstones' ultimately successful appeal from the trial court's ruling in the Gregorys' favor was pending. *Id.* at 532.

   *Horvath* ignores the rule that "a legal right embodied in the covenants" precludes a "relative hardship evaluation[,]" *Sandstrom v. Larsen,* 59 Haw. 491, 499, 583 P.2d 971, 973 (1978) (internal quotation marks and citations omitted), and thus is subject to the same objections discussed in the text *supra.* If followed in this jurisdiction, *Horvath* would establish a new rule which, at most, would require the majority, as in *Horvath,* to remand this case to determine which one of the Defendants "had actual or constructive notice of [the] litigation so as to preclude the balancing of equities" in their behalf. *Horvath,* 637 P.2d at 533. Such an approach poses even more conceptual problems.

an action for injunctive relief against these WRE Defendants' successors-in-interest.

## VII.

Alternatively, even if the doctrine of relative hardship should be applied, the majority's application of the doctrine under these facts leads to an inequitable result. "The doctrine of relative hardship, sometimes called 'balancing the equities,' is applied in situations in which the enforcement of a restriction will harm the defendant *without substantially benefitting the plaintiff's land.*" *Powell, supra,* § 60.10[3] at 60–150 (footnote omitted) (emphasis added).

Here, enforcement of the restrictive covenant will "substantially benefit[ ]" Pelosi. *Id.* As noted in *Pelosi I,* the purpose of the MM III Covenants was to "establish and insure a sound and proper subdivision for residential purposes." 10 Haw.App. at 428, 876 P.2d at 1323 (brackets omitted). To effectuate that purpose, the MM III Subdivision was divided into 273 houselots and fifteen roadway parcels. *Id.* Use of the houselots, such as Pelosi's houselot and Lot 29, was restricted to residential purposes. *Id.* Pelosi purchased his lot with the belief that the neighboring lot would be used for a houselot, not that it would be used for a roadway and tennis court of an adjoining subdivision. Enforcing the restrictive covenant would obviously preserve and thus substantially benefit the residential nature of the MM III Subdivision and Pelosi's lot, as was intended when the MM III Subdivision was created.

## VIII.

The majority, however, further finds that in balancing the equities, Pelosi was guilty of "laches." Although laches was raised as an affirmative defense in the answers filed by the WRE Defendants and the Individual Defendants and at trial, there has never been

---

**6.** I question whether on appeal this court can, in effect, make a finding of laches, a fact-intensive determination which is left to trial courts.

**7.** In *Pelosi v. Wailea Ranch Estates,* No. 20254, 91 Hawai'i 137, 980 P.2d 1011 (Haw.App. May 1, 1998) (mem.), *vacated and remanded,* No. 20254 (Haw. June 12, 1998) (order), this court ruled that *a mandatory injunction should issue*

an express finding that Pelosi committed laches.

Assuming that the equitable defense of laches could be applied by this court at this late stage in the proceedings,[6] the facts of this case do not support the conclusion that Pelosi committed laches.[7]

The majority concluded, ·in relevant part, as follows:

Our review of the record indicates that there was substantial evidence adduced below to support the ... court's findings that the *roadway* was substantially completed by July 1987 and that Pelosi did not express concerns about the roadway until late 1987 at the earliest. ...

Since Pelosi waited until May 1988 to formally request that the WRE Defendants remove the roadway and until August 1988 to file the instant action, we cannot conclude that the ... court erred when it considered Pelosi's delay, balanced the equities, determined that closing up the roadway would deprive the Individual Defendants of access to the WRE Subdivision and create too much of a hardship on them, and consequently, declined to award Pelosi mandatory injunctive relief.

Majority opinion at 532, 985 P.2d at 1099 (underscored emphasis in original) (italicized emphases added).

### A.

With respect to the equitable defense of laches, the Hawai'i Supreme Court has ruled that

[t]he doctrine of laches reflects the equitable maxim that "equity aids the vigilant, not those who slumber on their rights." Where applicable, it acts to bar a court from considering an equitable action ... because of a perception that it is more equitable to defendants and important to

against the WRE Defendants *and* the Individual Defendants for removal of both the roadway *and* the tennis court. Now, under the same facts and record, the majority determines that laches bars Pelosi's claim with respect to the roadway. Without additional facts supporting a claim for laches, I cannot agree with the majority's change of opinion.

society to promote claimant diligence, discourage delay and prevent the enforcement of stale claims.

Adair v. Hustace, 64 Haw. 314, 320–21, 640 P.2d 294, 300 (1982) (quoting 2 S. Symonds, *Pomeroy's Equity Jurisprudence* § 418 (5th ed.1941)) (footnote omitted).

Two components must exist before the doctrine of laches will apply. *Adair*, 64 Haw. at 321, 640 P.2d at 300. "First, there must have been a delay by the plaintiff in bringing his claim, and that delay must have been unreasonable under the circumstances." *Id.* "Second, that delay must have resulted in prejudice to the defendant." *Id.* The supreme court further emphasized that " '[i]n suits in equity the question [of diligence] is determined by the circumstances of each particular case.' " *Id.* (quoting *Patterson v. Hewitt*, 195 U.S. 309, 317, 25 S.Ct. 35, 49 L.Ed. 214 (1904)).

Also, with respect to injunctive relief in general, a complainant is entitled to a reasonable time in which to decide whether injunctive relief should be sought:

> Lapse of time will not defeat a complainant's right to injunctive relief unless it appears that he had knowledge or ample means of knowledge of all the circumstances upon which his rights depend, and of the violation or threatened violation of those rights, since without such knowledge or means of acquiring knowledge implied assent cannot be imputed to him, nor can it be said that he permitted the defendant to proceed to his disadvantage.... *[O]ne is not required to seek injunctive relief as soon as he obtains knowledge of the facts entitling him thereto; he is allowed a reasonable time in which to consider whether it is advisable to seek such relief.*

42 Am.Jur.2d *Injunction* § 63 at 809 (1969) (emphasis added). Under the circumstances, I do not believe Pelosi unreasonably delayed bringing his claim.

### B.

Pelosi testified that the ultimate use of Lot 29 as a roadway lot was not immediately evident since the lot was initially used to transport materials to the subdivision:

> In the second half of 1987, we noticed that a dirt path was cleared through the mountain side of the lot, that is Lot 29, the lot next [door] to us, and all kinds of vehicles, machines and trucks were going back and forth, and *we figured they [we]re using this as a way to do some work back there.*
>
> Subsequently, they concerned [sic] some more of [Lot 29] and kept bringing in all kind of fill materials, building [Lot 29] up. And then, finally, in the latter part of 1987, they brought in more fill and material, and it was to the point that next to our property line there were about five feet, there was a bank about five feet high and they were all spilling, trespassing onto our property.
>
> . . . .
>
> [Construction of the tennis court began *a]fter they paved the road, either the end of 1987 or beginning of 1988*[.]

(Emphases added.)

Pelosi did not simply wait until May 1988 to request removal of the roadway as the majority intimates. He testified that in October or November 1987 he requested information on the WRE Subdivision and the use of Lot 29. In response, Defendant–Appellee Eduardo F. Bello (Bello), one of the WRE partners, gave Pelosi a packet of information describing the WRE Subdivision. The packet contained a map which showed access to the WRE Subdivision through Lot 29, but did not specify the type of access over Lot 29.

Pelosi also testified that "around the same time," October or November 1987, three of the WRE partners, Defendants–Appellees Hugh Jeffrey Farrington (Farrington), John Kean (Kean), and Stephen K. Rink (Rink), "barg[ed]" into his office. Pelosi related he told Farrington, Kean, and Rink that construction of a roadway and tennis court on Lot 29 by WRE would be "a violation of the [MM III] Covenants[.]" According to Pelosi, Farrington, Kean, and Rink denied that a roadway was being built on Lot 29. Instead, Farrington, Kean, and Rink stated that WRE was building "just a private driveway." They also stated that WRE was "considering" building a tennis court on Lot 29. *See*

Majority opinion at 529, 985 P.2d at 1096 n. 2.

However, as the majority observes in a footnote, more than a year earlier, a March 12, 1986 letter from WRE partner, Defendant–Appellee Stephen Pitt (Pitt), to Alvin K. Fukunaga, Director of Public Works for the County of Maui (County), "clearly reveals that the roadway and tennis court were part of the WRE Defendants' initial plans for Lot 29." [8]

According to Pelosi, after the subject meeting, he made several attempts to find out what was occurring on Lot 29. Pelosi testified that he "phoned the County[, and] ... went up to the County Land Use [Office], in person, .... to look at maps and ... the subdivision folder, [and/or] meet with someone to get details."

8. That letter stated, in relevant part:

   The ... preliminary subdivision approval [of the County of Maui (County)] dated January 20th, 1986, Section 1.C requested that a fire hydrant be installed to serve Lot [29]. It is requested that this requirement be dropped due to the fact that *Lot [29] is a roadway lot.* The remnant of the land remaining after roadway construction is smaller than County requirements for residential construction. *The intent in this instance is to construct a tennis court on this portion of land.*
   Majority opinion at 529, 985 P.2d at 1096 n. 2 (emphasis in original).

9. The November 10, 1987 letter stated, in part:

   You may recall our telephone conversation regarding my concerns with the kind of landscape modification that is taking place adjacent to and mauka of my residence[.] My wife shares these concerns.
   ....
   A visit to the Real Property Tax Division revealed that TMK 2–1–19–85 [Lot 29] had been dropped. The elimination of this parcel/lot and its use, now and in the future, for purposes other than those for which it was intended, gives rise, in my opinion, to numerous concerns and problems.
   I will defend people's right to develop their property provided that what they do is allowed by law and governmental agencies, and does not negatively affect others. However, my concerns lead me, for the moment, into asking the County the following questions:
   1. *Is what used to be Lot 29 going to be used for a sort of "community" tennis court?* In other words, would what used to be a residential lot in one subdivision be used for these purposes by the owners of lots in a

In a letter dated November 10, 1987 from Pelosi to Kenneth Kong of the Land Use and Codes Administration of the County, Pelosi asked about the uses of Lot 29 for a tennis court and roadway and County approvals of such uses.[9] From the record, it appears that Pelosi did not receive a response to his letter.[10]

Then, as noted in a letter dated May 18, 1988, Pelosi's attorney, Edward F. Mason (Mason), notified Rink of Pelosi's demand that the WRE Defendants remove the roadway and return Lot 29 to residential purposes.[11]

In a letter dated May 26, 1988, Rink responded that WRE believed the construction on Lot 29 did not violate the MM III Covenants and that "[t]he partnership ... intends to completed [sic] the tennis court."

   different subdivision? If this has been approved, who approved it?
   2. *Who approved the use of Lot 29 (TMK 2–1–19–85) as a road for access from an existing subdivision [MM III] to a new subdivision [WRE Subdivision]?*
   A written reply at your earliest convenience will be appreciated.
   (Emphases added.)

10. While the issue is not raised by the parties, this case may raise serious questions about whether a governmental agency whose attention has been called to a recorded restrictive covenant (which does not violate public policy) may lend approval to clear violations of that covenant.

11. The letter stated, in relevant part, as follows:

   *Obviously Lot 29 is not being used by your client [ (WRE) ] for residential purposes but for a roadway to service its subdivision. The use of the lot in this fashion not only violates the [MM III C]ovenants* but constitutes an offensive nuisance in its own right. The idea that your client would in addition erect a tennis court on the property simply aggravates its violation of the covenants and its creation of a nuisance in a residential neighborhood.
   My clients [ (Pelosi and his wife) ] have attempted to discuss this matter on a number of occasions with you and your client, all to no avail. By this letter demand is hereby made upon your client to remove its road from Lot 29, together with all other asphalt covering, and to regrade the same and return it to residential uses. If this is not done within the next ten days, then the aid of the courts will be sought without further notice to you.
   (Emphasis added.)

Mason sent a follow-up letter to Rink dated August 10, 1988. That letter advised Rink that a complaint would be filed on August 16, 1988, "unless by that date [WRE] ha[d] agreed either to remove the road and tennis court from Lot 29 or ha[d] otherwise made an acceptable settlement offer to [Pelosi]." Thereafter, on August 26, 1988, Pelosi filed his verified complaint in the court.

Assuming Pelosi was aware of the use of Lot 29 as a roadway in July, he took a little more than a year to file suit; assuming, as he testified, that the permanency of the roadway only became evident toward the end of 1987, suit was filed in less than a year. In the meantime, he apparently sought the intervention of the County, the cooperation of the WRE Defendants, and the help of an attorney. Certainly, delay was caused by the WRE Defendants because as the majority recognizes, the WRE Defendant "were not candid with Pelosi about their plans for the lot." Majority opinion at 529–530, 985 P.2d at 1096–1097. I do not believe the steps taken by Pelosi unreasonably delayed the case under the circumstances. They were rational and prudent steps taken in deciding whether it was "advisable to seek" ultimate relief through the court. 42 Am.Jr.2d, *supra*, at 809.

12. At the least, a title search should have disclosed the pending litigation.

The record indicates that counsel for Pelosi sent letters dated August 26, 1988 to (1) Standard, an escrow company handling sales of lots in the WRE Subdivision, and (2) Security Title Corporation (Security), purported to be an escrow company also involved in the sale of lots in the WRE Subdivision, notifying both companies that Pelosi had filed a complaint concerning the use of Lot 29 and requesting Standard and Security to "please notify the [potential b]uyers of [the lots in the WRE Subdivision] that the [c]omplaint filed by ... Pelosi seeks to restrain the further use of [Lot 29] as a roadway access to the subdivision and as a tennis court."

It may be noted that the record contains a document entitled "Preliminary Report," prepared by Title Guaranty of Hawaii, Inc. and dated March 2, 1990, which was identified at trial, but not introduced into evidence. The preliminary report, which was for Lot 6 of the WRE Subdivision, clearly showed that title to that lot was subject to the MM III Covenants and Pelosi's pending lawsuit:

## C.

Even assuming that Pelosi's delay was unreasonable, I do not believe the delay "resulted in prejudice to the defendant[s]." *Id.*

I do not see how, given their knowledge of the covenant and their subsequent conduct, it could be said that the WRE Defendants would be prejudiced in any way by a supposed unreasonable delay. They simply chose to disregard the covenant.

Like the WRE Defendants, the Individual Defendants and Sohn had notice that Lot 29 was subject to the MM III Covenant at issue and yet chose to purchase lots in the WRE Subdivision. Presumably, those of the Defendants who purchased subsequent to the filing of Pelosi's complaint would have had additional notice by way of the pending litigation.[12] Accordingly, whatever delay might be attributable to Pelosi had no effect on the conduct of the Individual Defendants and Sohn.

## IX.

Assuming *arguendo* that the equities must be balanced, I believe the court and the majority are incorrect in prohibiting Pelosi from adducing evidence that an alternative means of access to the WRE Subdivision may be available. *See Pelosi I*, 10 Haw.App.

Title Guaranty of Hawaii, Inc. hereby reports that title to [Lot 6 of the WRE Subdivision] is vested in:

O'GREEN ESTATE

a [Hawai'i] registered general partnership

Subject only to those matters set forth in Schedule "B" hereof. This report is to the hour of 8:00 o'clock a.m. on March 2, 1990.

....

SCHEDULE B

....

3. –AS TO [Lots 10, 11, and 12 of the WRE Subdivision]:–

....

(C) Covenants, conditions and restrictions dated November 5, 1971, recorded in Liber 8043 at Page 464.

....

8. Pending Civil No. 88–0422(3), filed in the Circuit Court of the Second Circuit, State of [Hawai'i], ANGELO PELOSI (Attorney(s) Edward F. Mason and Eugene S. Evans, Jr.), "Plaintiff", vs. WAILEA RANCH ESTATES, a [Hawai'i] General Partnership, et al., "Defendants," re: use of Lot 29.

at 442 n. 5, 876 P.2d at 1329 n. 5 (noting that Pelosi "contends that there is a 'fire break' road available to Defendants and that Lot 29 is merely the most convenient access to [the WRE Subdivision]").

During trial, Kean testified that the fire break road was initially used as access to the WRE Subdivision:

> [Counsel for Pelosi]: At the time of the purchase of the 20 acres, or right before, I believe, you told me that you had seen or been over a temporary access to those 20 acres through ... one of the roads that ends at [MM III Subdivision], you are aware of which one I mean, because we went over that?
>
> [Kean]: The fire break.
>
> [Counsel for Pelosi]: Whatever you want to call—
>
> [Kean]: It was a fire break.
>
> [Counsel for Pelosi]: That was a temporary access to that 20 acres?
>
> [Kean]: *Fire break is a temporary access, because the Lot 39 was not 29, was not yet graded. We brought on the fire break above to the 20 acres with initial—*
>
> [Counsel for Pelosi]: *You got back and forth through it, through the fire break?*
>
> [Kean]: *Initially, initially.*
>
> [Counsel for Pelosi]: That is a rough fire break?
>
> [Kean]: Very tough.
>
> [Counsel for Pelosi]: *You can get there?*
>
> [Kean]: *I could.*

(Emphases added.)

Subsequently, Paul Mancini (Mancini), an attorney for 'Ulupalakua Ranch (Ranch), testified that Ranch consolidated Lot 29 into a larger twenty-acre lot prior to conveying the subdivision to the WRE Defendants in order to provide the "most convenient access" to the subdivision:

> [Mancini]: ... By consolidating Lot [29] with the larger lot, we only had one lot we could sell the whole property to the purchasers.
>
> [Counsel for WRE Defendants]: Can you tell the [c]ourt and the [j]ury why there was that consolidation?

> [Mancini]: Well, ... Ranch had owned Lot [29] and *it appeared that this was the most convenient type access into this property for these people who wanted to buy the property.*

(Emphasis added.)

Following trial, on December 6, 1990, the court entered findings of fact (findings) and conclusions of law (conclusions) adverse to Pelosi on his claims for injunctive and declaratory relief. Finding 9 stated, "Following its acquisition of Lot 29 and the adjoining parcel, [the WRE Defendants] constructed a tennis court on Lot 29 and a road across Lot 29. *Said road was absolutely necessary as an access to the [WRE] Subdivision ... as every subdivision, to be legal, must have an access.*" (Emphasis added.) Pelosi appealed from finding 9, contending that the fire break road is "a possible alternate access" to the subdivision. *Pelosi I,* 10 Haw.App. at 435, 876 P.2d at 1326. This court, however, found it "unnecessary" to address Pelosi's appeal with respect to the fire break road because this court concluded "as a matter of law, that [the WRE Defendants and the Individual Defendants] breached the restrictive covenant in question." *Id.*

During remand, Pelosi moved the court to allow testimony on the issue of an alternative access to the WRE Subdivision. Attached to the motion was an affidavit of Spencer C. Ryland, P.E., a licensed professional engineer in the State of Hawai'i (Ryland). Ryland prepared a report "concerning the feasibility of constructing an access road to [the WRE Subdivision] from Launa Drive, one of the public roads on the [MM III] Subdivision" (the report). A copy of the report was attached to Ryland's affidavit and stated as follows:

> An existing fire break road already exists along the proposed alignment.... It is understood that this existing rough-graded road provides emergency fire access along the northern boundary of [the WRE Subdivision]. This road connects to the existing paved water reservoir access roadway on Launa Drive.
>
> *Upgrading the existing road to a residential access roadway which satisfies Maui County Design Standards would be a rela-*

*tively straightforward, simple process from a civil engineering perspective.* The most challenging portion would be crossing a small drainage gulch. This would be accomplished with twin-arch culverts and a fill, similar to the ones presently existing in Plat 19 of [MM III Subdivision] downstream of the proposed crossing.

Outside of this minor drainage construction, the roadway would be constructed using a leveling course of crushed aggregate subbase on top of the existing solid rock, asphalt treated base on top of the subbase, and a surface wearing course of asphalt concrete.

(Emphasis added.) The report included a map showing the location of the fire break road and photographs of the road.

The court denied Pelosi's motion.

I believe this was an abuse of discretion.

In *Pelosi I*, this court did not instruct the court on remand to restrict its review of the evidence to that adduced at trial. 10 Haw. App. at 446, 876 P.2d at 1331. Indeed, this court did not decide whether finding 9, which was appealed by Pelosi, was correctly made, thus leaving that issue open on remand in conjunction with its instruction that "the trial court may balance the equities." *Id.* Therefore, in order for the court to fairly "balance the equities," evidence of an alternative access which obviated any alleged hardship should have been considered. However, on remand, the court apparently took the position that it was not going to receive any evidence outside of that which had already been received at trial.[13]

## X.

Finally, the case should be remanded for a determination of damages which have been and/or will be suffered by Pelosi as a result of the breach of covenant.

On November 29, 1995, Pelosi filed a "Memorandum on Damages" in which he asserted that breach of the restrictive covenant caused (1) diminution in value of Pelosi's property in the amount of $100,000 to $150,-000, and (2) loss of the economic use of Pelosi's property in the amount of $34,160.

On December 6, 1995, the Defendants (ostensibly the WRE Defendants and the Individual Defendants) filed their "Responsive Memorandum on Damages," arguing that Pelosi was not entitled to damages in addition to the $20,000 already awarded by the jury on Pelosi's nuisance claim.

Pelosi was awarded a nominal judgment of two dollars for breach of the covenant. In its findings the court apparently disregarded Pelosi's testimony because (1) the jury had made an award for nuisance caused on Lot 29, and (2) Pelosi's claims were based on his own opinion.[14]

> THE COURT: And that's why I wondered why we're here today because *I already told you guys I'm not going to hear any evidence on this.* The only thing I'm going to hear evidence on, and I asked you guys to submit, and, in fact, [Counsel for Pelosi], as I recollect you were going to submit a memo [ (on damages).]
> [COUNSEL FOR PELOSI]: That's correct.
> THE COURT: *That's all that's remaining, as far as I'm concerned.* This motion, although technically was not brought up at the last time, I did rule on it orally and my ruling was I was going to deny that motion. Same thing. Okay.

(Emphases added.)

13. The transcript of the November 16, 1995 hearing indicates as follows:

> [COUNSEL FOR PELOSI]: I filed a motion on the first part. I asked the [c]ourt to issue a mandatory injunction removing the record [sic] because the defendants had intentionally or taken a chance on violating the covenants.
> THE COURT: That's the one I had the findings of fact.
> [COUNSEL FOR PELOSI]: *That's correct, but in addition to that, and without being asked, you also did what I guess the phrase is balance of the equities and denied it. I think that the Intermediate Appellate Court intended additional evidence to be received on that issue. You didn't receive it. I'm asking you to receive it.*
> THE COURT: And at our last hearing it was brought up, I think it was brought up at the last hearing when I ruled on the first issue. *It was brought up orally. [Counsel for Defendants] had not yet responded, as I recollect, but you had already filed your motion for additional testimony.*
> [COUNSEL FOR PELOSI]: *That's correct.*

14. The court's findings of fact stated, in relevant part:

> 4. Activities associated with the construction, use and maintenance of the tennis court[ ] and roadway *were considered by the jury at trial in their award to [Pelosi] for his nuisance cause of action.*

I believe the court was in error. First, at trial, the jury found that the restrictive covenant had not been breached. In contrast, *Pelosi I* determined, as a matter of law, that the restrictive covenant had been breached. Because the jury erroneously found that there was no breach of covenant, Pelosi could not have been fully compensated under the jury's nuisance award. Thus, Pelosi has a claim for special and consequential damages against the Defendants arising from violation of the restrictive covenant. *See* Powell, *supra*, § 60.07 at 60–121—60–122.

Second, I believe Pelosi's own testimony concerning the value of his land following the breach of the covenant was sufficient without any other evidence to establish his purported damages. *See Territory v. Adelmeyer*, 45 Haw. 144, 158, 363 P.2d 979, 987 (1961) ("An owner, by virtue of his ownership and consequent familiarity with the land and real estate market, is generally held to be qualified to give his opinion as to the value of his land, the weight to be given such testimony being a question for the jury.") Therefore, the nominal judgment should be set aside and the issue of damages for breach of the covenant remanded for redetermination.

5. The continuation of these activities could have arguably had an affect [sic] on the adjacent property values.

6. [Pelosi] is a licensed real estate broker and gave his estimate of what amount of diminution in value to his property the construction of Lot 29 has caused.

7. [Pelosi's] conclusion that his lot should be worth $500,000 but could not sell for more than $360,000 to $375,000 were he to disclose the use of Lot 29 is based upon his own review of what was selling and comparable sales as well as his perceived loss of his ability to enjoy his property as he should.

8. *This conclusion was based entirely upon [Pelosi's] opinion and was not substantiated or corroborated by any other evidence.*

9. *Even if [Pelosi] were qualified as an expert in land appraisal,* his opinion would still have required some basis in fact which could be readily identified and substantiated.

10. *[Pelosi] did not call any other witnesses* to include residents of his property, tenants of his property, experts on property appraisals, other brokers or even neighbors to substantiate his conclusions as to diminution of value and loss of economic use of his property. (Emphases added.)